# COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

Suffolk Superior Court
Trial Court Department

---

JULIAN GREEN, EUGENE IVEY, JAMES P. MCKENNA, and LISA NEWMAN-POLK, individually and on behalf of all others similarly situated,

*Plaintiffs,*

*v.*

MASSACHUSETTS DEPARTMENT OF CORRECTION, CAROL MICI, Commissioner of the Massachusetts Department of Correction, in her official capacity, SIRCHIE ACQUISITION CO. LLC, PREMIER BIOTECH, INC.,

*Defendants.*

---

*7/29/2021*

Docket No:

## CLASS COMPLAINT FOR VIOLATIONS OF:

**(1) Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I;**
**(2) Common Law Negligence; and**
**(3) Massachusetts Declaratory Judgment Act, Mass. Gen. Laws ch. 231A, §1**

**JURY TRIAL and INJUNCTIVE RELIEF REQUESTED**

Plaintiffs Julian Green, Eugene Ivey, James P. McKenna, and Lisa Newman-Polk, on behalf of themselves and those similarly situated, allege as follows:

**<u>INTRODUCTION</u>**

1.      Defendant Massachusetts Department of Correction (the "DOC") uses fake drug tests on legal mail to interfere with incarcerated people's right to communicate with their counsel and punish them without due process. These tests are purportedly designed to detect synthetic cannabinoids and are manufactured and sold by Defendants Sirchie Acquisition Company, LLC ("Sirchie") and its sales agent Premier Biotech, Inc ("Premier Biotech"). When used to test for drugs sprayed on paper (such as legal mail), these tests are less accurate than witchcraft, phrenology, or simply picking a number out of a hat. Interactions with innocuous chemicals commonly found in paper frequently create false positives—almost 80% of the time, according to one DOC official's estimate.

2.      Once a false positive has been generated, the DOC presents the incarcerated person with an untenable dilemma: they can either accept responsibility for a crime they did not commit and suffer the punishment; or they can request a laboratory test—but be subjected to solitary confinement and loss of privileges while DOC waits for the test results, which can often take months. Moreover, the DOC threatens to impose significant fines and expenses on any person whose laboratory testing comes back positive, including by forcing the person to pay for such tests—further coercing incarcerated people into confessing to crimes they did not commit in order to escape the threat of crushing punishment. Many incarcerated people are now refusing legal mail—their main form of communication with their (often Court-appointed) counsel during the pandemic—rather than being subjected to this arbitrary and unconstitutional process.

3.      Defendants Sirchie and Premier Biotech falsely promote their tests as accurate—despite a staggering rate of false positives—knowing that the DOC is using them to "test" legal mail and improperly punish incarcerated people based on the results. Even though the DOC

knows that Sirchie's tests are unreliable, it regularly accuses legal professionals across Massachusetts of sending drugs into prisons based on those tests.

4.      Plaintiffs Eugene Ivey and Julian Green are individuals incarcerated by the DOC. Both were falsely accused and punished based on Sirchie's faulty test. Plaintiffs James McKenna and Lisa Newman-Polk are attorneys who were falsely accused of trying to smuggle drugs into the prison on their legal mail. Plaintiffs bring this case on behalf of themselves and all similarly situated incarcerated people and legal professionals to redress Defendants' unconstitutional and illegal conduct.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction over this case pursuant to its general jurisdiction under Massachusetts General Laws chapter 212, § 4.

6.      This Court has personal jurisdiction over Defendant Massachusetts Department of Correction because it is an agency of the Commonwealth of Massachusetts. The Court has personal jurisdiction over Defendant Carol Mici because she is an employee of the Commonwealth of Massachusetts and because she is charged, by statute, with the responsibility for overseeing the administration of all state correctional facilities in the Commonwealth.

7.      This Court has personal jurisdiction over Defendants Sirchie Acquisition Company, LLC and Premier Biotech, Inc. pursuant to Mass. Gen. Laws ch. 223, §§ 3(a)-(d) because they each transacted business in Massachusetts, contracted to supply services or things in Massachusetts, and/or caused tortious injury in the Commonwealth by their acts or omissions.

8.      This Court has personal jurisdiction over Plaintiffs pursuant to Mass. Gen. Laws ch. 223, § 3(g) because they are domiciled in the Commonwealth of Massachusetts.

9.      This Court is a proper venue pursuant to Mass. Gen. Laws ch. 223, § 1.

## PARTIES

10.      **Plaintiff Julian Green** is a citizen of the Commonwealth of Massachusetts. He is currently incarcerated at MCI-Norfolk. Mr. Green has been incarcerated for fourteen years.

While in custody, Mr. Green has taken every opportunity to advance his education, even taking college classes at Boston University. He also runs a program called the Young Men's Committee, which plans events and brings outside speakers into the prison.

11.     **Plaintiff Eugene Ivey** is a citizen of the Commonwealth of Massachusetts. He is currently incarcerated at the DOC's Northeastern Correctional Center in Concord. Mr. Ivey was sentenced to life in prison with the possibility of parole when he was seventeen years old, twenty-six years ago. Mr. Ivey has made every effort to rehabilitate himself by participating in extensive programming, including taking courses in the Tufts University Prison Initiative of Tisch College. On March 26, 2020, the Massachusetts Parole Board recognized Mr. Ivey's accomplishments and granted him parole by unanimous vote, observing that Mr. Ivey "has fully invested in his rehabilitation."

12.     **Plaintiff James P. McKenna** is a citizen of the Commonwealth of Massachusetts. Mr. McKenna has practiced law in Massachusetts since 1986. He is a respected appellate attorney, and his practice requires extensive correspondence by mail with his incarcerated clients. Mr. McKenna has worked in the Private Counsel Division of the Massachusetts Committee for Public Counsel Services for the past 12 years. Mr. McKenna has served as an Adjunct Teaching Professor at Worcester Polytechnic Institute for more than 28 years, where he teaches courses on law and ethics. He also serves as a Senior Fellow with the Pioneer Institute, a public policy think tank dedicated to advancing prosperity and civic life in Massachusetts, and holds the role of Town Moderator in his community.

13.     **Plaintiff Lisa Newman-Polk** is a citizen of the Commonwealth of Massachusetts. Ms. Newman-Polk is a respected criminal defense attorney who has spent years working with the Massachusetts Committee for Public Counsel Services, both as a staff attorney and as part of the Private Counsel Division. She is also a licensed social worker. Ms. Newman-Polk serves on the Board of Directors for Prisoners' Legal Services and is an active member of the Massachusetts Chapter of the National Association of Social Workers. Ms. Newman-Polk's current practice focuses on representing people who were incarcerated as juveniles with a life sentence and who

are now seeking parole, which requires extensive correspondence by mail with her incarcerated clients.

14.     **Defendant Massachusetts Department of Correction** is an agency of the Commonwealth of Massachusetts responsible for overseeing the Massachusetts prison system. The DOC manages 16 institutions and oversees approximately 8,000 incarcerated people throughout the Commonwealth. The DOC has a place of business in Suffolk County.

15.     **Defendant Carol Mici** is the Commissioner of the Massachusetts Department of Correction. By statute, Defendant Mici is responsible for the administration of all state correctional facilities in Massachusetts. *See* Mass. Gen. Laws ch. 124, § 1. Defendant Mici's responsibilities include overseeing the operations and personnel of the DOC statewide, including DOC facilities and personnel in Suffolk County. Plaintiffs sue Defendant Mici in her official capacity.

16.     **Defendant Sirchie Acquisition Company, LLC** is a Delaware corporation headquartered in North Carolina. Sirchie manufactures drug tests, including drug tests sold under its "NARK II" brand. Sirchie advertises, distributes, and sells its products directly and indirectly to Massachusetts, and Sirchie's website identifies a dedicated sales representative for Massachusetts.

17.     Sirchie sells its products directly to Massachusetts agencies, including the DOC. In 2019, Sirchie bid for and won a contract to sell its products to the Massachusetts Department of State Police, Department of Fire Services, and the DOC. Sirchie provides training for Massachusetts DOC employees regarding how to use its tests.

18.     **Defendant Premier Biotech, Inc.** is incorporated and headquartered in Minnesota. Premier Biotech advertises, distributes, and sells Sirchie's products in Massachusetts. In 2017, Premier Biotech bid for and won a contract to sell Sirchie's NARK II tests to the Massachusetts DOC. On information and belief, Premier Biotech communicates the DOC's orders to Sirchie and relays information from Sirchie to the DOC.

## FACTS

### A.   Sirchie's Tests

19.      Sirchie manufactures a variety of drug tests, including tests under the NARK II brand.[1] Sirchie claims that its NARK II tests use "crime lab accepted chemistry" and are "[d]esigned to function as a transportable narcotics laboratory."

20.      The NARK II product line includes the NARK 20023 tests, which Sirchie markets as suitable "[f]or the presumptive identification of" eight synthetic cannabinoids.

21.      "Synthetic cannabinoids" is a catch-all term used to refer to hundreds of human-made chemicals designed to simulate tetrahydrocannabinol, the primary active ingredient in marijuana. Synthetic cannabinoids can be sprayed onto plant matter or paper, which can then be smoked.

22.      Each of the field drug tests in the Sirchie NARK II product line, including the NARK 20023 test, is fundamentally flawed, and none can reliably detect the drugs for which they purport to test. The significant deficiencies in the NARK 20023 test and the associated training materials Sirchie provides with that test illustrate the magnitude of the problem:

1.   *Sirchie's NARK 20023 Tests Yield a High False Positive Rate*

23.      The NARK 20023 tests yield false positives at rates so high that its results are worse than random. And Sirchie was aware of these issues before it began selling its NARK 20023 tests. In October of 2012, Sirchie issued a "NARK News" brochure acknowledging that the unique features of synthetic cannabinoids "make[] it ***almost impossible***" to develop a "field test that will not have too many unacceptable false positives." Although none of the "unique

---

[1] "NARK" stands for "Narcotics Reagent Analysis Kit."

features" that make a reliable test for synthetic cannabinoids "nearly impossible" have changed, Sirchie was manufacturing and marketing its NARK 20023 by 2013.

24.     The rate of false positives of the NARK 20023 is so high that even DOC employees are aware that the test is unreliable. A DOC employee advised Plaintiff McKenna that she believed the tests produced false positives ***up to 80% of the time.***

25.     One reason for the extremely high false positive rate for the NARK 20023 test is that Sirchie provides incomplete, inadequate, and misleading instructions, warnings, and training with the tests.

26.     Sirchie instructs users that yellow or orange coloration on the paper testing strip included with the NARK 20023 tests indicates a positive result. Sirchie's instructions suggest that *any* yellow or orange coloration indicates a positive result, even though such discoloration can be caused by innocuous factors that have nothing to do with the presence of drugs.

27.     For instance, the highly acidic chemicals used in the NARK 20023 test routinely turn paper light yellow or tan, regardless of whether synthetic cannabinoids are present in or on the paper. In fact, the test is likely to discolor paper even where it is completely devoid of foreign chemical compounds, causing the strips to display colors consistent with positive results. Sirchie fails to warn users of this risk. Nor does Sirchie warn its users that compounds present in commercially available papers, printers, and inks frequently cause discoloration, creating erroneous "positive" results.

### 2.   *Sirchie's NARK 20023 Tests Cannot Identify Most Synthetic Cannabinoids in Circulation*

28.     In addition to yielding an unacceptably high rate of false positive results, the NARK 20023 test is also broadly *under*inclusive: it cannot identify most synthetic cannabinoids in circulation today, including those most commonly identified in the DOC.

29.     Sirchie states that its NARK 20023 test is capable of identifying only eight specific synthetic cannabinoid formulas—out of the hundreds of synthetic cannabinoid formulas in circulation. These eight formulas have been the same since at least July 2013.

30.     According to data collected by the National Forensic Laboratory Information System ("NFLIS"), most synthetic cannabinoids found in the market in the last five years would not be detected by Sirchie's NARK 20023 test—even assuming it worked as advertised. According to NFLIS's data, the specific formulas Sirchie's NARK 20023 test purports to identify are now outdated and rarely, if ever, found in circulation at DOC facilities today.

31.     The NFLIS data is consistent with reports coming out of the DOC itself. During eighteen months of testing samples identified by the DOC as potentially including synthetic cannabinoids, the University of Massachusetts Drugs of Abuse Lab ***did not once*** identify any of the eight synthetic cannabinoid formulas which the NARK 20023 test purports to be able to detect.

**B.      Sirchie's Inadequate Training**

32.     Sirchie provides its customers with written materials regarding its tests, as well as pre-recorded and live webinar trainings. The DOC has outsourced the training of its correctional officers on the use of Sirchie's tests to Sirchie, and DOC employees are only permitted to use Sirchie's field tests if they have received training from Sirchie within two years.

33.     Sirchie provides training and instructions regarding its tests that are misleading and inadequate, resulting in a failure to warn the DOC about the foreseeable dangers of using the tests for a purpose and in a manner which would harm the Plaintiff Classes.

**C.      The DOC's Use of Sirchie's Tests**

34.     Sirchie's tests return results that are over- or under-inclusive, or both. Sirchie's tests are therefore unreliable and unsuited to the field identification of drugs. Nevertheless, under the supervision or at the direction of Commissioner Mici, the DOC uses Sirchie's tests throughout its facilities. Among other things, the DOC uses Sirchie's tests on incoming legal mail, purportedly to identify drugs sent into DOC facilities. When the tests return positive results—as they often do, regardless of whether drugs are present in or on the mail—the DOC imposes immediate punishment on the addressee.

35.     The DOC's imposition of *any* punishment on incarcerated people in reliance on Sirchie's tests is a violation of the fundamental rights guaranteed by the Massachusetts Constitution.

36.     Moreover, the DOC's reliance on those tests furthers no legitimate goal or policy of the Commonwealth. Even assuming that wrongdoers were sending legal mail containing drugs into DOC facilities, Sirchie's products cannot reliably identify the drugs for which they purport to test—resulting in an (assumed) inflow of drugs that is unimpeded by the DOC's use of Sirchie's tests.

### 1. Sirchie Supplies the DOC with Tests via Vendor Premier Biotech

37.     In 2017, the DOC solicited bids for "products that detect drugs of abuse at all of [the DOC's] institutions." Premier Biotech's winning bid promised to provide a variety of Sirchie NARK II tests, including the NARK 20023 tests, which it touted as "NEW!" and called "a Synthetic Cannabinoids Reagent."

38.     The DOC's solicitation imposed specific requirements, including that the products "meet all legal standards that relate to the legal validity of the tests when the tests are being used as a screening test for alcohol or illicit drug use" and that "screening/testing devices shall be as sensitive as possible." The DOC also required the bidder to "provide documentation establishing the accuracy of the screening/testing devices, based on clinical test results," to "identify all substances the screening/testing device will not detect, or will not produce a positive result for the categories of drugs identified above," and to "identify all substances known to cross-react, yielding a potentially false-positive result."

39.     Premier Biotech's bid response did not include any of this required information, and the DOC was unable to provide it in response to a public records request.

40.     The DOC also established a minimum threshold for "Product Reliability," requiring that "[f]alse positives shall not exceed .05%," noting that the DOC "will monitor false positives" and that "[f]alse positives between .05% and 10% may be grounds for termination of a

Contractor's contract." The DOC specifically stated that "[f]alse positives exceeding 10% will result in contract termination."

41.     In response to a public records request, the DOC was unable to provide any documents suggesting that it monitors the false positive rates associated with any of Sirchie's tests, including the Sirchie NARK 20023 tests.

42.     On information and belief, the DOC is not monitoring or tracking those rates despite knowing that the false positive rates for Sirchie's tests exceed the .05% and 10% thresholds set by DOC. The DOC continues to purchase, use, and rely on Sirchie's tests to impose immediate punishment on incarcerated people.

### 2.  *The DOC's Reliance on Sirchie's Tests Violates the Due Process Rights of Incarcerated People*

43.     Massachusetts recognizes "the importance of the use of mail by inmates to maintain appropriate contact with the community" and has established regulations allowing for incarcerated people to send and receive mail. 103 CMR 481.01. These regulations recognize the critical need for people in prison to be able to confidentially communicate with their attorneys, and the regulations accordingly set out detailed procedures and heightened protections for legal mail. *See* 103 CMR 481.10; 103 CMR 481.11.

44.     Since at least 2018, however, the DOC, at the direction or under the supervision of Commissioner Mici, has been using Sirchie's tests on legal mail and relying on false positives to punish incarcerated people. The DOC's reliance on Sirchie's faulty tests to take *any* action against incarcerated people violates the due process clause of the Massachusetts Constitution.

45.     When the DOC receives legal mail directed to an incarcerated person, an Inner Perimeter Security Officer or other DOC employee ("Corrections Officer" or "CO") will bring the mail to that individual. Before the DOC permits the incarcerated person to receive the mail, it requires the person to confirm, in writing, that they are accepting the mail—despite not permitting the incarcerated person to see the contents of the mail or to otherwise confirm the mail's legitimacy prior to making such confirmation.

46.     Once the incarcerated person signs to accept the mail, the CO will "inspect" the mail, purportedly to identify any contraband or "suspicious" mail. The DOC has not articulated any guidelines as to what makes mail "suspicious," leaving it to the discretion of DOC personnel.

47.     If the reviewing CO deems the mail to be "suspicious" for any reason, the CO will take the mail out of view for testing using the Sirchie tests.

48.     At the direction or under the supervision of Commissioner Mici, the DOC uses Sirchie's products to test "suspicious" legal mail for drugs—including by using Sirchie's NARK 20023 test purportedly to screen for synthetic cannabinoids. In order to test the mail using Sirchie's tests, the CO often cuts out pieces of the legal mail itself, sometimes rendering the document unreadable. If the Sirchie test returns a "positive" result—as it often does, in light of the faulty nature of those tests—the DOC takes immediate punitive measures against the person to whom the mail was addressed, even before issuing a formal disciplinary ticket.

49.     In addition, at the direction or under the supervision of Commissioner Mici, the DOC attempts to dissuade incarcerated people from seeking to have their mail evaluated using laboratory testing by threatening that they will be required to pay for that testing. The DOC actively punishes incarcerated people both before they are given the opportunity to request laboratory testing and while waiting for the results of the laboratory tests—which often takes weeks or months. The DOC uses this time and threat of expense to try to coerce people into admitting the charges the DOC brought against them solely on the basis of the Sirchie test results in exchange for an immediate cessation of the ongoing punitive measures.

50.     In essentially all circumstances, and regardless of whether the incarcerated person persists in demanding a laboratory test, the DOC issues the incarcerated person a disciplinary ticket. Such issuance violates 103 DOC 525.08(C)(2), which authorizes tickets only where the DOC "has reason to believe a disciplinary offense has been committed by an inmate." 103 DOC 525.08(C)(2).

51.     A positive Sirchie test on incoming legal mail *cannot* be a valid "reason to believe" that the addressee has committed any offense. Even assuming that incoming mail contained drugs, the mere fact that mail is addressed to a person cannot support the conclusion that the person to whom the mail was addressed did anything wrong. This is especially true here, because the DOC requires incarcerated people to confirm in writing that they are willing to accept the mail at issue before allowing the person to see the contents of the mail or to confirm its legitimacy. Penalizing people for events entirely outside of their control violates every articulation of the right to due process under the Massachusetts Constitution.

52.     The DOC's punishment of incarcerated people based on a Sirchie test separately violates the person's due process rights because those tests return an extremely high level of false positives—and a "positive" test is therefore not evidence of *anything*.

53.     In addition to the issuance of a disciplinary ticket, the DOC imposes a number of other punishments on incarcerated people on the basis of Sirchie's faulty tests, before laboratory testing is conducted. Those punitive measures include severe curtailments on the person's eligibility for parole or transfer, limitations on their ability to contact attorneys and family members, and termination of their ability to hold a job or participate in educational or other programming.

54.     At the direction or under the supervision of Commissioner Mici, the DOC frequently punishes people who are accused of receiving drugs in their legal mail by placing them immediately into solitary confinement in reliance on the Sirchie test. The DOC frequently does not provide the person with a disciplinary ticket explaining what they are accused of doing until days *after* it places them in solitary confinement or other restrictive housing conditions.

55.     This practice violates the DOC's own Regulations, which permit placement into Restrictive Housing only upon a finding by the Superintendent that "(a) the inmate poses an unacceptable risk to the safety of others, of damage or destruction [of] property, or to the operation of a correctional facility; (b) the inmate requires protection from harm by others; and/or (c) the inmate is serving a disciplinary detention sanction." 103 CMR 423.06.

56.     None of those situations exists for people whose only "offense" was to be the addressee on mail tested positive by Sirchie's tests. A positive Sirchie test result presents no evidence whatsoever that a person presents *any* "risk to the safety of others, of damage or destruction [of] property, or to the operation of a correctional facility." In the same vein, a positive Sirchie test does not demonstrate that the person requires protection from harm by others. Finally, the DOC cannot rely on a separate "disciplinary detention sanction" to impose the punishment of Restrictive Housing here, because incarcerated people are routinely confined to such conditions before they have even received a disciplinary ticket, much less a formal disciplinary hearing. Despite failing to satisfy any of the grounds for Restrictive Housing set out by regulation, the DOC nevertheless relies on Sirchie's test to impose serious punishment on people whose mail tests positive.

57.     On information and belief, the DOC also fails to perform a meaningful tri-weekly "Placement Review" for people held in Restrictive Housing on the basis of Sirchie tests, as required by regulation. Indeed, the DOC is permitted to keep a person in Restrictive Housing following each Placement Review "only if the Superintendent or designee determines that the inmate poses an unacceptable risk: (a) to the safety of others, (b) of damage or destruction or property, or (c) to the operation of a correctional facility." 103 CMR 423.09(1)(b). No such determination is possible based on Sirchie's faulty tests.

### D.  Defendants' Conduct Is Causing Immediate and Irreparable Harm

58.     Defendants' conduct is causing immediate and irreparable injury to Plaintiffs and the Classes.

59.     The deprivation of the right to counsel is an intangible injury. Chilling that right is irreparable harm. Word of the false testing has spread through the prison system.

60.     After their prior experiences, Mr. Ivey, Mr. Green, and the Incarcerated Class are scared to accept legal mail. Plaintiffs want to and would otherwise receive mail from their counsel.

61.     Without the benefit of written correspondence, incarcerated people are being deprived of the opportunity to review copies of the materials filed in their cases or to otherwise participate in their own defense. As a result, they can miss deadlines and are deprived of the opportunity to point their counsel to relevant factual evidence or errors in pleadings and other court paperwork. They may default on their appeals, lose issues for collateral review, and be subjected to unconstitutional conditions of confinement.

62.     Attorneys are scared to send their clients mail and frequently are forced to spend time and incur additional expenses to communicate outside of the legal mail system—options which have been unavailable or even more burdensome during the pandemic. Attorneys are inhibited in their ability to perform their constitutionally protected—and in many instances Court-appointed—role as zealous advocates for their clients.

63.     In addition, at the direction or under the supervision of Commissioner Mici, the DOC grossly invades the protections afforded to privileged attorney-client communications by taking legal mail out of the sight of the recipient, testing it using a product that requires the physical alteration of the documents themselves, making copies of the legal mail, and keeping original legal documents "in evidence." Even the perception that the DOC may have an opportunity to read the contents of legal mail during these clandestine operations chills the willingness of both attorneys and clients to communicate honestly and comprehensively.

64.     The DOC's use of Sirchie's faulty tests also imposes tangible harm. Lawyers and legal professionals experience severe distress as a result of false accusations that jeopardize their work and their reputation. Because the DOC has provided no guidance to attorneys about how they can ensure that their mail does not run afoul of Sirchie's faulty tests, they incur significant additional expenses to communicate with their clients, including changing the manner in which they print and mail documents, having to travel many miles to deliver materials to clients in person, and losing earnings from time spent making these and other accommodations. And falsely accused incarcerated people suffer intensive confinement and deprivation of the few

"privileges" they are afforded by the DOC, such as the ability to work, pursue an education, and to communicate, including contact visits with family members and loved ones.

      **E.**    **Plaintiffs and Plaintiff Classes Have Suffered Substantial Injuries as a Result of Defendants' Wrongful Conduct**

          *1.*   *The DOC used Sirchie's test to falsely accuse Mr. McKenna, a preeminent defense attorney, of sending drugs to a client*

65.      On August 1, 2018, Mr. McKenna met with his client who was then imprisoned at the DOC's Souza-Baranowski Correctional Center. Later that day, Mr. McKenna sent his client legal mail, consisting of a letter and copies of two appellate decisions.

66.      On August 6, 2018, Mr. McKenna received a call from an officer the Souza-Baranowski Correctional Center. The officer asked Mr. McKenna whether he had sent the August 1, 2018 correspondence and accompanying materials to his client. Mr. McKenna confirmed that he had. The officer told Mr. McKenna that the paper he had sent had tested positive for "K2," a slang term for synthetic cannabinoids.

67.      Mr. McKenna had not put synthetic cannabinoids on his mail.

68.      The accusation caused Mr. McKenna considerable distress. He worried about harm to his client from the DOC and he worried about being criminally charged himself. Mr. McKenna felt deeply concerned that the accusation against him would affect his employment and his reputation in the community. He was unsure whether he would be able to communicate safely and securely with not just the client to whom he had sent the seized communication, but also to his other clients across Massachusetts.

69.      One day after the DOC seized the mail sent by Mr. McKenna, his client was informed that his legal mail had tested positive for synthetic cannabinoids. His client was placed on "Awaiting Action" status for three days, during which he was confined to his cell and in isolation for twenty-three hours per day.

70.      At the end of that three-day period, the DOC issued Mr. McKenna's client a disciplinary ticket for seeking to bring contraband into the prison, via Mr. McKenna's letter. He was offered the opportunity to send the mail out for further testing, but the DOC warned him that

if the second test came back positive, he would face a $100 charge on top of being subjected to—and required to pay for—monthly drug testing.

71.     As a result of the disciplinary ticket, Mr. McKenna's client also lost his job and his only opportunity to earn income: $2 for a full day of work, seven days a week. Just before this incident, Mr. McKenna's client had been approved to be moved to a lower security prison, where he would have had considerably more privileges and freedom, included extended, in-person visitation opportunities with his family, as well as more physical safety. The disciplinary ticket prevented the move, forcing him to remain in the more restrictive, higher security prison.

72.     Ten weeks after the false positive test result, on October 23, 2018, Mr. McKenna's client reported that officials at the Souza-Baranowski Correctional Facility offered to give him the job he wanted, drop the pending ticket, and allow him to proceed towards a lower classification if he were to say that Mr. McKenna intentionally sent him contraband. Mr. McKenna's client refused the DOC's coercive offer.

73.     Over the next three months, Mr. McKenna wrote a letter in support of his client and called the Souza-Baranowski Correctional Center several times. He spoke with a DOC employee, who described the confirmatory testing process to Mr. McKenna. During at least two of those calls, that employee told Mr. McKenna that, in up to 80% of cases, the Sirchie NARK 20023 positive result was proven to be false by laboratory testing.

74.     The disciplinary ticket lodged against Mr. McKenna's client remained pending throughout the Fall of 2018, preventing him from obtaining a lower security classification or his preferred job.

75.     On December 4, 2018, just shy of four months after the false positive Sirchie 20023 test result, Mr. McKenna again called the DOC, which informed him that the laboratory test of his mail had come back negative and the ticket pending against his client would be dismissed.

76.     Mr. McKenna's client never received the confidential legal communication from Mr. McKenna.

### 2. The DOC used Sirchie's test to falsely accuse Plaintiff Green of importing drugs into prison via legal mail sent by the Boston College Innocence Program, resulting in two months of severe punishment and the destruction of confidential attorney-client communications

77.     In early November 2019, Mr. Green received legal mail from the Boston College Innocence Program while he was incarcerated at MCI-Norfolk. An officer summoned Mr. Green, showed him that he had received mail from the clinic, and had Mr. Green sign to accept it. The officer then opened the mail in front of Mr. Green and examined it. The officer told Mr. Green he was taking the mail away for testing.

78.     Later that day, Mr. Green was called to the Internal Perimeter Security office, where several officers were waiting. The officers told Mr. Green that his legal mail had tested positive for "K2."

79.     Mr. Green was immediately sent to the Restrictive Housing Unit ("RHU"), where he was confined to a cell for twenty-three hours per day.

80.     Approximately two days after being sent to the RHU, Mr. Green was issued a disciplinary ticket. At that time, Mr. Green was offered the opportunity to request that his mail be sent out to a laboratory for additional testing, but to do so he had to agree to pay a fee of $100 for the testing if the results were positive for synthetic cannabinoids, or $50 even if the test was negative. Additionally, he was threatened with a $432 charge for three years of mandatory, bi-monthly drug testing. Mr. Green was given a photocopy of his legal mail, a copy made by DOC officials outside the presence of both Mr. Green and his attorney.

81.     The DOC ultimately forced Mr. Green to spend three weeks in the RHU. During that time, Mr. Green missed his college classes and an event for troubled teens that he had been planning with the Young Men's Committee for eight months. His ability to communicate with people or receive visits was severely limited.

82.     Two months after the initial Sirchie test, laboratory testing confirmed that there were no drugs on Mr. Green's legal mail.

83.     When Mr. Green finally received the original copy of his legal mail, it was unreadable because the DOC had cut out so much of the paper to conduct the Sirchie test. Mr. Green described the mail as looking like a "paper snowflake."

84.     As a result of this experience, Mr. Green remains extremely nervous about and reluctant to receive legal mail.

> 3. ***The DOC used Sirchie's test to falsely accuse Plaintiff Newman-Polk of sending drugs to her client, Plaintiff Ivey, resulting in his immediate punishment and jeopardizing a favorable parole decision***

85.     On March 26, 2020, Mr. Ivey obtained a grant of parole from the Massachusetts Parole Board, a hard-earned accomplishment that took twenty-five years to achieve.

86.     On August 31, 2020, Mr. Ivey was approached by DOC staff in the room where legal mail is distributed. The officer showed Mr. Ivey a package from his lawyer, Plaintiff Newman-Polk, which included her name and address, and Mr. Ivey verified that Ms. Newman-Polk was his attorney. The officer then opened Mr. Ivey's legal mail and reviewed its contents. He removed one document, calling it "suspicious," and gave the rest of the legal mail to Mr. Ivey.

87.     Shortly after Mr. Ivey returned to his cell, additional COs called him back to the mail room. They detained Mr. Ivey and other COs entered his cell and seized all the legal materials sent to him that day by Ms. Newman-Polk. They later told Mr. Ivey that the materials had tested positive for synthetic cannabinoids.

88.     Mr. Ivey was moved to the RHU, where he was confined to his cell for twenty-three hours per day. DOC staff accused him of trafficking drugs and demanded that he name his co-conspirators. Mr. Ivey denied the accusations, repeatedly explaining the mail had come from his lawyer and could not have contained drugs, and requesting laboratory testing on the mail.

89.     Upon learning about these accusations, Ms. Newman-Polk and her co-counsel contacted multiple DOC staff, including Commissioner Mici, and confirmed the legitimacy of the legal mail. They offered to provide a sworn affidavit attesting they had sent the legal mail

and it contained no drugs. They emphasized that Mr. Ivey had no incentive to jeopardize his hard-won parole and urged the DOC to dismiss the charges and release him.

90.     The DOC nevertheless issued a Disciplinary Report against Mr. Ivey, charging him with eight separate offenses arising from his receipt of legal mail, including two in the most serious offense category available. Shortly thereafter, the DOC moved Mr. Ivey from the RHU to the Special Adjustment Unit ("SAU"), a different punitive housing unit focused on substance use disorder and behavior-related programming, which he did not need. In the SAU, Mr. Ivey was permitted only three to four hours out of his cell every day, was unable to attend his college courses, and was forced to take a lower-paying job.

91.     Unbeknownst to Mr. Ivey or Ms. Newman-Polk, the University of Massachusetts Medical School Drugs of Abuse Lab had analyzed Ms. Newman-Polk's legal mail on September 18, 2020, and determined that it did not contain any drugs. Nonetheless, on September 28th, the DOC informed Ms. Newman-Polk that Mr. Ivey was being punished for "receiving mail that *purported* to be legal mail and which is suspected to be K2/Synthetic Cannabinoids" and maintained its punitive measures against Mr. Ivey.

92.     It was not until October 14, 2020, that the DOC dismissed the Disciplinary Report against Mr. Ivey on the basis of the lab results.

93.     Ms. Newman-Polk described her experience in a letter to Commissioner Mici on October 26, 2020: "To say that this experience has been highly upsetting is an understatement. It has had a negative impact on my health and my family, as any accusation against Mr. Ivey was effectively an accusation that I committed a serious criminal offense. Although I did nothing wrong, I felt responsible for Mr. Ivey's circumstances since I was the one who sent the mail."

94.     Due to the punishment imposed on Mr. Ivey by the DOC, Mr. Ivey missed nearly a full semester of college courses, delaying his graduation from the program. Mr. Ivey was traumatized by his confinement in the Restrictive Housing Unit and the Secure Adjustment Unit. The most significant impact on Mr. Ivey's life, however, was the threat to his parole. Mr. Ivey had worked very hard to educate himself and prove he was someone who deserved a chance at

parole. He would not have done anything to jeopardize that, and a serious disciplinary offense like the one he was wrongly accused of could have resulted in the parole decision being revoked.

## CLASS ALLEGATIONS

95.     This is a class action under Rule 23 of the Massachusetts Rules of Civil Procedure.

96.     Plaintiffs seek to represent two Classes defined below, pending any modifications necessitated by discovery.

97.     The Incarcerated Class is defined as:

> All people incarcerated in Massachusetts DOC facilities whose legal mail or legal paperwork is or was subject to a Sirchie test.

98.     The Legal Professional Class is defined as:

> All people who represent an individual incarcerated in Massachusetts DOC facilities or sent legal mail to an individual incarcerated in Massachusetts DOC facilities.

99.     Excluded from each Class are: Sirchie, Premier Biotech, and any entities in which those companies have a controlling interest; any entities in which Sirchie or Premier Biotech's officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of Sirchie or Premier Biotech; any federal, state, or local governmental entities; the Judge and/or jury to whom this case is assigned and any member of the Judge's or jury's immediate family and any other judicial officer or juror assigned to this case; and any attorneys representing Plaintiffs or the Classes in this action.

A.      **Each Class meets the requirements for certification**

100.    The Legal Professional Class and the Incarcerated Class each meet the requirements for certification under Rule 23 of the Massachusetts Rules of Civil Procedure.

101.    Numerosity. The members of each Class are so numerous that joinder of all members is impracticable. The exact number or identification of members in each Class is presently unknown. On information and belief, each Class includes hundreds of individuals. One

indication of the numerosity of each Class are the thousands of Sirchie tests Premier Biotech has sold to the Massachusetts DOC, including more than 1,600 NARK 20023 tests since 2018.

102.    The identity of the Class members is ascertainable and can be determined based on available records maintained by the DOC. On information and belief, the DOC maintains records of its use of Sirchie tests and the punishments it imposes in reliance on those tests. In addition, on information and belief, the DOC routinely contacts legal professionals whose mail has tested positive and keeps an internal record of those conversations.

103.    <u>Predominance of Common Questions of Law and Issues of Fact</u>. There are multiple questions of law and fact common to each Class that will predominate over questions affecting only individual Class members, including, but not limited to:

a)  Whether the DOC interfered with the constitutionally protected right to counsel by using Sirchie's tests on legal mail;

b)  Whether the DOC violated the Incarcerated Class' due process rights by punishing them for the simple act of receiving legal mail;

c)  Whether Sirchie's tests produce false positives and/or negatives at rates which render them inappropriate as a basis for punishment or other action by the DOC against the addressee or the legal professional who sent the mail;

d)  Whether Sirchie negligently produced, marketed, and sold tests with high false positive and false negative rates;

e)  Whether Sirchie negligently failed to ensure its training materials conformed to applicable standards;

f)  Whether Sirchie negligently trained DOC employees on the use of its tests, including adequate training on the foreseeable harms and misuses of the tests;

g)  Whether Premier Biotech negligently sold Sirchie's tests to the DOC, despite their extremely high false positive and negative rates; and

h)  What damages and injunctive relief should be awarded to redress the harms suffered by each Class.

104.    Defendants' actions are common to all members of each Class.

105.     <u>Typicality</u>. Defendants' conduct caused Plaintiffs to suffer injuries similar to the other members of their respective Classes.

106.     <u>Adequacy</u>. Plaintiffs are adequate representatives of each Class because they have a strong personal investment in the outcome of this litigation and their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs are represented by experienced and competent Class Counsel. Class Counsel intends to prosecute this action vigorously for the benefit of the entire Class. Plaintiffs and Class Counsel can fairly and adequately protect the interests of all of the Members of the Classes.

107.     <u>Superiority</u>. The class action is superior to other available methods for fairly and efficiently adjudicating this controversy because individual litigation of Class members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. There is no foreseeable difficulty in managing this action as a class action and it provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## <u>COUNT I</u>

<u>Violation of the Massachusetts Civil Rights Act (Mass. Gen. Laws ch. 12, § 11) Deprivation of Right to Counsel</u>
<u>On Behalf of the Incarcerated Class</u>
<u>Against Defendants DOC and Commissioner Carol Mici</u>

108.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

109.     The Massachusetts Constitution guarantees incarcerated persons the right to due process. In many respects, the Constitution of the Commonwealth of Massachusetts provides broader protections than the United States Constitution.

110.     Under the supervision or at the direction of Commission Carol Mici, the DOC has interfered and/or attempted to interfere with the enjoyment by Plaintiffs Ivey, Green and the

22

Incarcerated Class of their constitutional rights to counsel and access to the courts by way of threats, intimidation, or coercion.

111.     As described herein, the DOC under Commissioner Mici's direction or supervision is significantly impeding the ability of members of the Incarcerated Class to confer confidentially with their attorneys. By arbitrarily testing incoming legal mail with the faulty Sirchie tests, by imposing draconian (and illegal) sanctions upon incarcerated people immediately upon any presumptive positive test, and by baselessly accusing attorneys of sending drugs into DOC facilities, the DOC has threatened both incarcerated people and their advocates who attempt to exercise their constitutional rights to counsel, to participate in their own defenses, and to access the courts.

112.     As a direct result of the DOC's unlawful conduct, directed or condoned by Commissioner Mici, Plaintiffs Ivey, Green, and members of the Incarcerated Class have suffered and continue to suffer deprivations of their constitutional right to counsel.

113.     Plaintiffs Ivey, Green, and members of the Incarcerated Class therefore seek entry of an order enjoining the DOC from using the Sirchie tests on legal mail and from relying on the Sirchie tests as the basis for any actions taken with respect to incarcerated people.

## <u>COUNT II</u>

<u>Violation of the Massachusetts Civil Rights Act (Mass. Gen. Laws ch. 12, § 11) Deprivation of
Right to Due Process
On Behalf of the Incarcerated Class
Against Defendants DOC and Commissioner Carol Mici</u>

114.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

115.     Under the Massachusetts Constitution, incarcerated people may not be deprived of life, liberty, or property without due process of law.

116.     Under the supervision or at the direction of Commission Carol Mici, the DOC has interfered and/or attempted to interfere with the enjoyment by Plaintiffs Ivey, Green, and

members of the Incarcerated Class of their constitutional rights to due process by way of threats, intimidation, or coercion.

117.    Among other things, the DOC under Commissioner Mici's direction or supervision has interfered with the due process rights of Plaintiffs Ivey, Green, and members of the Incarcerated Class by imposing punishment and depriving them of the various liberty interests described herein—including by placing them in solitary confinement and/or in other restrictive housing—in knowing reliance on inadequate and inaccurate drug tests.

118.    The DOC under Commissioner Mici's direction or supervision has further violated Plaintiffs Ivey, Green, and members of the Incarcerated Class's due process rights by punishing them in reliance on mail *addressed* to them, without giving them an opportunity to review the contents of that mail to confirm its legitimacy and without the DOC providing any evidence whatsoever of how the incarcerated person actually was involved—aside from the associational relationship of being represented by counsel (which includes Court-appointed counsel)—in any wrongdoing related to the sending of that legal mail. Penalizing people for events entirely outside of their control violates every articulation of the right to due process under the Massachusetts Constitution.

119.    The DOC under Commissioner Mici's direction or supervision accomplished such interference by threatening, intimidating, and coercing class members, including by forcing class members to forego their rights to due process in order to escape ongoing deprivations of liberty during the long pendency of confirmatory testing necessary to correct the faulty Sirchie testing.

120.    As a direct result of the DOC's unlawful conduct, directed or condoned by Commissioner Mici, Plaintiffs Ivey, Green, and members of the Incarcerated Class have suffered and continue to suffer deprivations of their constitutional right to due process.

121.    Plaintiffs Ivey, Green, and members of the Incarcerated Class therefore seek entry of an order enjoining the DOC from using the Sirchie tests on legal mail and from relying on the Sirchie tests as the basis for any actions taken with respect to incarcerated people.

**COUNT III**

Negligence
On Behalf of Both Classes
Against Defendant Sirchie

122.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this complaint.

123.    Defendant Sirchie owed a duty to Plaintiffs and the Classes to:

   a)  ensure that the Sirchie's tests yielded consistently accurate and
       reliable results;

   b)  clearly warn its users about the high risk of false positives and
       false negatives resulting from the tests; and

   c)  prevent users from foreseeably misusing the tests, including by
       using the tests on paper samples and by using the tests to impose
       punishment in the carceral context without awaiting laboratory
       testing.

124.    Defendant Sirchie owed this duty to Plaintiffs and the Classes because:

   a)  Sirchie knew or should have known about the false positive and
       negative rates resulting from the tests it manufactures for sale;

   b)  Sirchie knew or should have known its products were sold for use
       in prisons, including the DOC;

   c)  Sirchie knew or should have known about the need to warn users
       about the limitations and risks of its products;

   d)  Sirchie knew or should have known that the foreseeable uses and
       misuses of its products would cause considerable harm to the
       Plaintiffs and the Classes;

   e)  Sirchie assumed responsibility for training DOC employees on the
       use of its tests; and

   f)  Sirchie was best situated to prevent the harms resulting from its
       faulty tests.

125.    Defendant Sirchie breached its duty to Plaintiffs and the Classes by:

a) Manufacturing and selling faulty products, including the NARK 20023 test, which was incapable of consistently and accurately identifying drugs;

b) providing false and misleading instructions and training materials that failed to warn users about the foreseeable risks of using the tests and the high rate of false positives and false negatives for those tests; and

c) failing to train DOC employees on the limitations of Sirchie's tests and failing to provide instructions and training that would prevent the foreseeable misuses of this test in the carceral context.

126.    As a direct result of Sirchie's unlawful conduct, Plaintiffs and the Classes have endured foreseeable pain and suffering, mental and emotional distress, humiliation, embarrassment, loss of liberty, and monetary damages.

**COUNT IV**
<u>Negligence</u>
<u>On Behalf of Both Classes</u>
<u>Against Defendant Premier Biotech</u>

127.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

128.    Defendant Premier Biotech owed a duty to Plaintiffs and the Classes to sell the DOC drug testing devices that did not carry an unacceptably high false positive and false negative rate, including by adhering to the requirement in the DOC's request for bids that the false positive rate for drug testing products must remain below .05%.

129.    Defendant Premier Biotech owed this duty to Plaintiffs and the Classes because Defendand Premier Biotech knew or should have known that selling drug testing products with a high false positive rate to the DOC would foreseeably harm the people subjected to accusations on the basis of those false positive test results.

130.    At all relevant times, Premier Biotech knew or should have known that Sirchie's tests, including the NARK 20023 tests, had an unacceptably high false positive rate. Indeed, pursuant to its contract with the DOC, Premier Biotech agreed to, but did not, provide statements

about the incidence of false positive results from Sirchie's tests along with its bid to sell the DOC those products.

131.    Premier Biotech breached its duty to Plaintiffs and the Classes by selling faulty tests to the DOC, and by failing to provide adequate warnings about the tests' limitations and deficiencies.

132.    As a direct result of Premier Biotech's unlawful conduct, Plaintiffs and the Classes have endured foreseeable pain and suffering, mental and emotional distress, humiliation, embarrassment, loss of liberty, and monetary damages.

## **COUNT V**

### Claim for Declaratory Judgment, Mass. Gen. Laws ch. 231A, §1
### On Behalf of the Incarcerated Class
### Against Defendants DOC and Commissioner Carol Mici

133.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

134.    A real and active controversy exists between the parties as to whether, by relying on the results of Sirchie's test as the basis for any punishment or other action taken against members of the Incarcerated Class, the DOC and Commissioner Mici have violated the civil rights guaranteed by the Massachusetts Constitution, including the right to due process and the right to counsel.

135.    Plaintiffs Ivey, Green, and the Incarcerated Class are entitled to a judgment declaring that:

   a)  The DOC's use of Sirchie's tests on legal mail violates the constitutionally protected rights of the Incarcerated Class;

   b)  The DOC's imposition of punishment based on the results of Sirchie's tests violates the due process rights of the Incarcerated Class; and

   c)  The DOC's imposition of punishment based on the results of Sirchie's tests interferes with and/or deprives the Incarcerated Class of their constitutionally protected rights to counsel and to participate in their own defense.

## **Prayer for Relief**

WHEREFORE, Plaintiffs pray that this Court:

A.      Certify this action as a Class Action under Rule 23 and appoint Mr. McKenna, Ms. Newman-Polk, Mr. Ivey, and Mr. Green as representatives of their respective Classes and their attorneys as Class Counsel;

B.      Enter judgment in favor of Plaintiffs and the Classes and against Defendants on each of the Counts stated above;

C.      Declare that the DOC's use of Sirchie's tests on legal mail at the direction of Commissioner Mici violates the constitutionally protected rights of the Incarcerated Class;

D.      Declare that the DOC's imposition of punishment based on the results of Sirchie's tests at the direction of Commissioner Mici violates the due process rights of the Incarcerated Class;

E.      Declare that the DOC's imposition of punishment based on the results of Sirchie's tests at the direction of Commissioner Mici interferes with and/or deprives the Incarcerated Class of their constitutionally protected rights to counsel and to participate in their own defense;

F.      Direct the DOC and Commissioner Mici to adjourn or expunge all disciplinary sanctions the DOC imposed as a result of the DOC's use of Sirchie's tests on legal mail;

G.      Temporarily enjoin the DOC from using Sirchie's tests on legal mail, until a system to verify legal mail with appropriate safeguards for the constitutionally protected rights to counsel, equal protection under the law, and the right to be free from cruel and unusual punishment can be developed;

H.      Permanently enjoin the DOC from using Sirchie's tests to evaluate the presence of drugs on paper correspondence or material;

I.      Award reasonable and just compensatory damages to Plaintiffs and the Classes for the injuries they suffered;

J.      Award Plaintiffs and the Classes costs and reasonable attorneys' fees, pursuant

Mass. Gen. Laws ch. 12, § 11I and Mass. Gen. Laws ch. 231A, § 7; and

K.      Grant such other further relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all claims so triable.


Dated: July 28, 2021                      Respectfully submitted,

                                          */s/ Janet Herold*
                                          Janet Herold (MA Bar No. 632479)
                                          Benjamin Elga (MA Bar No. 697933)
                                          Alice Buttrick*
                                          **Justice Catalyst Law, Inc**.
                                          123 William St., 16th Floor
                                          New York, NY 10038
                                          Tel: (518) 732-6703
                                          jherold@justicecatalyst.org
                                          belga@justicecatalyst.org
                                          abuttrick@justicecatalyst.org

                                          Ellen Leonida*
                                          Matthew Borden*
                                          Christman Rice*
                                          Amber Ashley James*
                                          **BraunHagey & Borden LLP**
                                          351 California Street, 10th Floor
                                          San Francisco, CA 94104
                                          Tel. & Fax: (415) 599-0210
                                          leonida@braunhagey.com
                                          borden@braunhagey.com
                                          rice@braunhagey.com
                                          james@braunhagey.com

                                          *Attorneys for Plaintiffs Julian Green, Eugene Ivey,
                                          James P. McKenna, and Lisa Newman-Polk and the
                                          Classes*

                                          **Pro hac vice* applications forthcoming