# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JULIAN GREEN, EUGENE IVEY, JAMES P. MCKENNA, and LISA NEWMAN-POLK, individually and on behalf of all others similarly situated,

     *Plaintiffs,*

*v.*

SIRCHIE ACQUISITION CO. LLC, and PREMIER BIOTECH, INC.,

     *Defendants.*

Docket No: 1:21-cv-11504

**FIRST AMENDED CLASS COMPLAINT FOR VIOLATIONS OF:**

  **(1) Common Law Negligence; and**
  **(2) Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2**

**JURY TRIAL and INJUNCTIVE RELIEF REQUESTED**

Plaintiffs Julian Green, Eugene Ivey, James P. McKenna, and Lisa Newman-Polk, on behalf of themselves and those similarly situated, allege as follows:

## INTRODUCTION

1.      Defendants Sirchie Acquisition Company LLC ("Sirchie") and its sales agent Premier Biotech, Inc ("Premier Biotech") manufacture and sell to the Massachusetts Department of Correction (the "DOC") fake drug tests purportedly designed to detect synthetic cannabinoids. Sirchie also trains the DOC on the use of these tests.

2.      Sirchie and Premier Biotech falsely promote their tests as accurate—despite a staggering rate of false positives—knowing that the DOC is using them to "test" legal mail and punish incarcerated people based on the results. When used to test for drugs sprayed on paper (such as legal mail), however, these tests are less accurate than witchcraft, phrenology, or simply picking a number out of a hat. Interactions with innocuous chemicals commonly found in paper frequently create false positives.

3.      Once a false positive has been generated, the DOC imposes severe and immediate punishments on the recipient of the tested mail, which may include fines, expenses, and time in solitary confinement. Many incarcerated people are now refusing legal mail—their main form of communication with their counsel during the pandemic—rather than be subjected to this arbitrary process.

4.      Plaintiff Eugene Ivey was formerly incarcerated by the DOC, and Plaintiff Julian Green continues to be incarcerated by the DOC. Both were falsely accused and punished as a direct result of Sirchie's faulty test. Plaintiffs James McKenna and Lisa Newman-Polk are attorneys who were falsely accused of trying to smuggle drugs into the prison on their legal mail. Plaintiffs bring this case on behalf of themselves and all similarly situated incarcerated people and legal professionals to redress Defendants' unfair, deceptive, and illegal conduct.

## JURISDICTION AND VENUE

5.      Defendant Sirchie removed this case to this Court on September 14, 2021.

**PARTIES**

6.    **Plaintiff Julian Green** is a citizen of the Commonwealth of Massachusetts. He is currently incarcerated at MCI-Norfolk. Mr. Green has been incarcerated for fourteen years. While in custody, Mr. Green has taken every opportunity to advance his education, even taking college classes at Boston University. He also runs a program called the Young Men's Committee, which plans events and brings outside speakers into the prison.

7.    **Plaintiff Eugene Ivey** is a citizen of the Commonwealth of Massachusetts. He was incarcerated at the DOC's Northeastern Correctional Center in Concord until August 19, 2021, when he was released on parole. He currently resides in Suffolk County. Mr. Ivey was sentenced to life in prison with the possibility of parole when he was seventeen years old, and was incarcerated for twenty-six years. During that time, Mr. Ivey made every effort to rehabilitate himself by participating in extensive programming, including taking courses in the Tufts University Prison Initiative of Tisch College. On March 26, 2020, the Massachusetts Parole Board recognized Mr. Ivey's accomplishments and granted him parole by unanimous vote, observing that Mr. Ivey "has fully invested in his rehabilitation."

8.    **Plaintiff James P. McKenna** is a citizen of the Commonwealth of Massachusetts. Mr. McKenna has practiced law in Massachusetts since 1986. He is a respected appellate attorney, and his practice requires extensive correspondence by mail with his incarcerated clients. Mr. McKenna has worked in the Private Counsel Division of the Massachusetts Committee for Public Counsel Services for the past 12 years. Mr. McKenna has served as an Adjunct Teaching Professor at Worcester Polytechnic Institute for more than 28 years, where he teaches courses on law and ethics. He also serves as a Senior Fellow with the Pioneer Institute, a public policy think tank dedicated to advancing prosperity and civic life in Massachusetts, and holds the role of Town Moderator in his community.

9.    **Plaintiff Lisa Newman-Polk** is a citizen of the Commonwealth of Massachusetts. Ms. Newman-Polk is a respected criminal defense attorney who has spent years working with the

Massachusetts Committee for Public Counsel Services, both as a staff attorney and as part of the Private Counsel Division. She is also a licensed social worker. Ms. Newman-Polk serves on the Board of Directors for Prisoners' Legal Services and is an active member of the Massachusetts Chapter of the National Association of Social Workers. Ms. Newman-Polk's current practice focuses on representing people who were incarcerated as juveniles with a life sentence and who are now seeking parole, which requires extensive correspondence by mail with her incarcerated clients.

10.     **Defendant Sirchie Acquisition Company, LLC** is a Delaware corporation headquartered in North Carolina. Sirchie manufactures, markets, and sells drug tests for profit in the ordinary course of its business. These products include drug tests sold under its "NARK II" brand.

11.     On information and belief, Sirchie does not maintain a place of business or assets in Massachusetts. Sirchie advertises, distributes, and sells its products directly and indirectly to Massachusetts. Sirchie sells its products directly to Massachusetts agencies, including the DOC. In 2019, Sirchie bid for and won a contract to sell its products to the Massachusetts Department of State Police, Department of Fire Services, and the DOC. Sirchie provides training for Massachusetts DOC employees regarding how to use its tests.

12.     **Defendant Premier Biotech, Inc.** is incorporated and headquartered in Minnesota. Premier Biotech markets and sells drug testing products, including Sirchie's NARK II tests, for profit in the ordinary course of its business.

13.     On information and belief, Sirchie does not maintain a place of business or assets in Massachusetts. In 2017, Premier Biotech bid for and won a contract to sell Sirchie's NARK II tests to the Massachusetts DOC. On information and belief, Premier Biotech communicates the DOC's orders to Sirchie and relays information from Sirchie to the DOC.

## **FACTS**

### A.    Sirchie's Tests

14.    Sirchie manufactures a variety of drug tests, including tests under the NARK II brand.[1] Sirchie claims that its NARK II tests use "crime lab accepted chemistry" and are "[d]esigned to function as a transportable narcotics laboratory."

15.    The NARK II product line includes the NARK 20023 tests, which Sirchie markets as suitable "[f]or the presumptive identification of" eight synthetic cannabinoids.

16.    "Synthetic cannabinoids" is a catch-all term used to refer to hundreds of human-made chemicals designed to simulate tetrahydrocannabinol, the primary active ingredient in marijuana. Synthetic cannabinoids can be sprayed onto plant matter or paper, which can then be smoked.

17.    Each of the field drug tests in the Sirchie NARK II product line, including the NARK 20023 test, is fundamentally flawed, and none can reliably detect the drugs for which they purport to test. The significant deficiencies in the NARK 20023 test and the associated training materials Sirchie provides with that test illustrate the magnitude of the problem:

### 1.    Sirchie's NARK 20023 Tests Yield a High False Positive Rate

18.    The NARK 20023 tests yield false positives at rates so high that its results are worse than random. And Sirchie was aware of these issues before it began selling its NARK 20023 tests. In October of 2012, Sirchie issued a "NARK News" brochure acknowledging that the unique features of synthetic cannabinoids "make[] it ***almost impossible***" to develop a "field test that will not have too many unacceptable false positives." Although none of the "unique features" that make a reliable test for synthetic cannabinoids "nearly impossible" have changed, Sirchie was manufacturing and marketing its NARK 20023 by 2013.

---

[1] "NARK" stands for "Narcotics Reagent Analysis Kit."

19.     Between July 2019 and March 2021, the DOC received information that laboratory testing by the University of Massachusetts Drugs of Abuse Laboratory revealed that at least 122 positive results from tests performed by DOC with Sirchie products were false positives for synthetic cannabinoids.

20.     One reason for the extremely high false positive rate for the NARK 20023 test is that Sirchie provides incomplete, inadequate, and misleading instructions, warnings, and training with the tests.

21.     Sirchie instructs users that yellow or orange coloration on the paper testing strip included with the NARK 20023 tests indicates a positive result. Sirchie's instructions suggest that *any* yellow or orange coloration indicates a positive result, even though such discoloration can be caused by innocuous factors that have nothing to do with the presence of drugs.

22.     For instance, the highly acidic chemicals used in the NARK 20023 test routinely turn paper light yellow or tan, regardless of whether synthetic cannabinoids are present in or on the paper. In fact, the test is likely to discolor paper even where it is completely devoid of foreign chemical compounds, causing the strips to display colors consistent with positive results. Sirchie fails to warn users of this risk. Nor does Sirchie warn its users that compounds present in commercially available papers, printers, and inks frequently cause discoloration, creating erroneous "positive" results.

### 2.     Sirchie's NARK 20023 Tests Cannot Identify Most Synthetic Cannabinoids in Circulation

23.     In addition to yielding an unacceptably high rate of false positive results, the NARK 20023 test is also broadly *under*inclusive: it cannot identify most synthetic cannabinoids in circulation today, including those most commonly identified in DOC facilities.

24.     Sirchie states that its NARK 20023 test is capable of identifying only eight specific synthetic cannabinoid formulas—out of the hundreds of synthetic cannabinoid formulas in circulation. These eight formulas have been the same since at least July 2013.

25.     According to data collected by the National Forensic Laboratory Information System ("NFLIS"), most synthetic cannabinoids found in the market in the last five years would not be detected by Sirchie's NARK 20023 test—even assuming it worked as advertised. According to NFLIS's data, the specific formulas Sirchie's NARK 20023 test purports to identify are now outdated and rarely, if ever, found in circulation at DOC facilities today.

26.     The NFLIS data is consistent with reports coming out of the DOC itself. During eighteen months of testing samples identified by the DOC as potentially including synthetic cannabinoids, the University of Massachusetts Drugs of Abuse Laboratory *did not once* identify any of the eight synthetic cannabinoid formulas which the NARK 20023 test purports to be able to detect.

**B.     Sirchie's Inadequate Training**

27.     Sirchie provides its customers with written materials regarding its tests, as well as pre-recorded and live webinar trainings. The DOC relies on Sirchie to train its correctional officers on the use of Sirchie's tests , and DOC employees are only permitted to use Sirchie's field tests if they have received training from Sirchie within two years.

28.     Sirchie provides training and instructions regarding its tests that are misleading and inadequate, resulting in a failure to warn the DOC about the foreseeable dangers of using the tests for a purpose and in a manner which would harm the Plaintiff Classes.

**C.     Premier Biotech Sells Sirchie Tests to the DOC**

29.     In 2017, the DOC solicited bids for "products that detect drugs of abuse at all of [the DOC's] institutions." Premier Biotech's winning bid promised to provide a variety of Sirchie NARK II tests, including the NARK 20023 tests, which it touted as "NEW!" and called "a Synthetic Cannabinoids Reagent."

30.     The DOC's solicitation imposed specific requirements, including that the products "meet all legal standards that relate to the legal validity of the tests when the tests are being used

as a screening test for alcohol or illicit drug use" and that "screening/testing devices shall be as sensitive as possible." The DOC also required the bidder to "provide documentation establishing the accuracy of the screening/testing devices, based on clinical test results," to "identify all substances the screening/testing device will not detect, or will not produce a positive result for the categories of drugs identified above," and to "identify all substances known to cross-react, yielding a potentially false-positive result."

31.     The DOC also established a minimum threshold for "Product Reliability," requiring that "[f]alse positives shall not exceed .05%," noting that "[f]alse positives between .05% and 10% may be grounds for termination of a Contractor's contract." The DOC specifically stated that "[f]alse positives exceeding 10% will result in contract termination."

32.     According to records produced by the DOC in response to a public records request, since at least July 2019, the DOC has been receiving information from the University of Massachusetts Drugs of Abuse Laboratory identifying false positive test results produced by Sirchie tests administered at DOC facilities. The number of false positives produced by Sirchie tests exceeds the DOC's .05% maximum error rate and its 10% threshold for contract termination.

**D.     Sirchie and Premier Biotech Know or Should Have Known that the DOC is Imposing Punishment Solely on the Basis of Sirchie's Faulty Tests**

33.     Since at least 2018, the DOC has been using Sirchie's tests on legal mail and relying on false positives to punish incarcerated people.

34.     Specifically, the DOC uses Sirchie's products to test "suspicious" legal mail for drugs—including by using Sirchie's NARK 20023 test purportedly to screen for synthetic cannabinoids. In order to test the mail using Sirchie's tests, the CO often cuts out pieces of the legal mail itself, sometimes rendering the document unreadable. If the Sirchie test returns a "positive" result—as it often does, in light of the faulty nature of those tests—the DOC takes immediate punitive measures against the person to whom the mail was addressed.

35.     Sirchie knows, or should have known, that the DOC was relying on its faulty tests to harm Plaintiffs and the Classes: Sirchie is expressly responsible for training the DOC on the use of its products. Nevertheless, Sirchie failed to adequately warn the DOC that its tests were not reliable, should not be used as the sole basis to determine culpability, and should not be used on paper at all.

36.     Premier Biotech also knows, or should have known, that the DOC was relying on the tests Premier sold to the agency to harm Plaintiffs and the Classes.

37.     On information and belief, Premier Biotech employees regularly communicated with the DOC about the reliability and integrity of the Sirchie tests.

38.     In one instance, a DOC employee specifically inquired about whether Sirchie's tests were reliable after another jurisdiction publicly announced that it would no longer be using the tests to impose punishment in a carceral setting. Premier Biotech's representative responded by providing a Sirchie training on the tests that did not explain the tests' extremely high false positive and negative rates, and subsequently reassured the DOC employee that Sirchie had not received any reports from customers that the tests were unreliable.

**E.      Plaintiffs and Plaintiff Classes Have Suffered Substantial Injuries as a Result of Defendants' Wrongful Conduct**

**1.      The DOC used Sirchie's test to falsely accuse Mr. McKenna, a preeminent defense attorney, of sending drugs to a client**

39.     On August 1, 2018, Mr. McKenna met with his client who was then imprisoned at the DOC's Souza-Baranowski Correctional Center. Later that day, Mr. McKenna sent his client legal mail, consisting of a letter and copies of two appellate decisions.

40.     On information and belief, the officer subjected Mr. McKenna's mail to a Sirchie test.

41.     On August 6, 2018, Mr. McKenna received a call from an officer the Souza-Baranowski Correctional Center. The officer asked Mr. McKenna whether he had sent the August 1, 2018 correspondence and accompanying materials to his client. Mr. McKenna

confirmed that he had. The officer told Mr. McKenna that the paper he had sent had tested positive for "K2," a slang term for synthetic cannabinoids.

42.     Mr. McKenna had not put synthetic cannabinoids on his mail.

43.     The accusation caused Mr. McKenna considerable distress. He worried about harm to his client from the DOC and he worried about being criminally charged himself. Mr. McKenna felt deeply concerned that the accusation against him would affect his employment and his reputation in the community. He was unsure whether he would be able to communicate safely and securely with not just the client to whom he had sent the seized communication, but also to his other clients across Massachusetts.

44.     One day after the DOC seized the mail sent by Mr. McKenna, his client was informed that his legal mail had tested positive for synthetic cannabinoids. His client was placed on "Awaiting Action" status for three days, during which he was confined to his cell and in isolation for twenty-three hours per day.

45.     At the end of that three-day period, the DOC issued Mr. McKenna's client a disciplinary ticket for seeking to bring contraband into the prison via Mr. McKenna's letter, based on the results of Sirchie's test. He was offered the opportunity to send the mail out for further testing, but the DOC warned him that if the second test came back positive, he would face a $100 charge on top of being subjected to—and required to pay for—monthly drug testing.

46.     As a result of the disciplinary ticket, Mr. McKenna's client also lost his job and his only opportunity to earn income. Just before this incident, Mr. McKenna's client had been approved to be moved to a lower security prison, where he would have had considerably more privileges and freedom, included extended, in-person visitation opportunities with his family, as well as more physical safety. The disciplinary ticket prevented the move, forcing him to remain in the more restrictive, higher security prison.

47.     Ten weeks after the false positive test result, on October 23, 2018, Mr. McKenna's client reported that officials at the Souza-Baranowski Correctional Facility offered to give him the job he wanted, drop the pending ticket, and allow him to proceed towards a lower

classification if he were to say that Mr. McKenna intentionally sent him contraband. Mr. McKenna's client refused the DOC's coercive offer.

48.    Over the next three months, Mr. McKenna wrote a letter in support of his client and called the Souza-Baranowski Correctional Center several times. He spoke with a DOC employee, who described the confirmatory testing process to Mr. McKenna.

49.    The disciplinary ticket lodged against Mr. McKenna's client remained pending throughout the Fall of 2018, preventing him from obtaining a lower security classification or his preferred job.

50.    On December 4, 2018, just shy of four months after the false positive Sirchie 20023 test result, Mr. McKenna again called the DOC, which informed him that the laboratory test of his mail had come back negative and the ticket pending against his client would be dismissed.

51.    Mr. McKenna's client never received the confidential legal communication from Mr. McKenna.

### 2.    The DOC used Sirchie's test to falsely accuse and punish Plaintiff Green for legal mail sent by the Boston College Innocence Program

52.    In early November 2019, Mr. Green received legal mail from the Boston College Innocence Program while he was incarcerated at MCI-Norfolk. An officer summoned Mr. Green, showed him that he had received mail from the clinic, and had Mr. Green sign to accept it. The officer then opened the mail in front of Mr. Green and examined it. The officer told Mr. Green he was taking the mail away for testing.

53.    On information and belief, the officer subjected Mr. Green's mail to a Sirchie test.

54.    Later that day, Mr. Green was called to the Internal Perimeter Security office, where several officers were waiting. The officers told Mr. Green that his legal mail had tested positive for "K2."

55.    Mr. Green was immediately sent to the Restrictive Housing Unit ("RHU"), where he was confined to a cell for twenty-three hours per day.

56.     Approximately two days after being sent to the RHU, Mr. Green was issued a disciplinary ticket based on the results of the Sirchie test. At that time, Mr. Green was offered the opportunity to request that his mail be sent out to a laboratory for additional testing, but to do so he had to agree to pay a fee of $100 for the testing if the results were positive for synthetic cannabinoids, or $50 even if the test was negative. Additionally, he was threatened with a $432 charge for three years of mandatory, bi-monthly drug testing. Mr. Green was given a photocopy of his legal mail, a copy made by DOC officials outside the presence of both Mr. Green and his attorney.

57.     The DOC ultimately forced Mr. Green to spend three weeks in the RHU. During that time, Mr. Green missed his college classes and an event for troubled teens that he had been planning with the Young Men's Committee for eight months. His ability to communicate with people or receive visits was severely limited.

58.     Two months after the initial Sirchie test, laboratory testing confirmed that there were no drugs on Mr. Green's legal mail.

59.     When Mr. Green finally received the original copy of his legal mail, it was unreadable because the DOC had cut out so much of the paper to conduct the Sirchie test. Mr. Green described the mail as looking like a "paper snowflake."

60.     As a result of this experience, Mr. Green remains extremely nervous about and reluctant to receive legal mail.

### 3.     The DOC used Sirchie's test to falsely accuse Plaintiff Newman-Polk of sending drugs to her client, Plaintiff Ivey, resulting in his immediate punishment and jeopardizing a favorable parole decision

61.     On March 26, 2020, Mr. Ivey obtained a grant of parole from the Massachusetts Parole Board, a hard-earned accomplishment that took twenty-five years to achieve.

62.     On August 31, 2020, Mr. Ivey was approached by DOC staff in the room where legal mail is distributed. The officer showed Mr. Ivey a package from his lawyer, Plaintiff Newman-Polk, which included her name and address, and Mr. Ivey verified that Ms. Newman-Polk was his attorney. The officer then opened Mr. Ivey's legal mail and reviewed its contents.

He removed one document, calling it "suspicious," and gave the rest of the legal mail to Mr. Ivey.

63.     Shortly after Mr. Ivey returned to his cell, additional correctional officers (COs) called him back to the mail room. They detained Mr. Ivey and other COs entered his cell and seized all the legal materials sent to him that day by Ms. Newman-Polk. They later told Mr. Ivey that the materials had tested positive for synthetic cannabinoids.

64.     Documents subsequently obtained by Mr. Ivey and his counsel revealed that the COs used Sirchie's test on Mr. Ivey's correspondence with his lawyer.

65.     Mr. Ivey was moved to the RHU, where he was confined to his cell for twenty-three hours per day. DOC staff accused him of trafficking drugs and demanded that he name his co-conspirators. Mr. Ivey denied the accusations, repeatedly explaining the mail had come from his lawyer and could not have contained drugs, and requesting laboratory testing on the mail.

66.     Upon learning about these accusations, Ms. Newman-Polk and her co-counsel contacted multiple DOC staff, including Commissioner Mici, and confirmed the legitimacy of the legal mail. They offered to provide a sworn affidavit attesting they had sent the legal mail and it contained no drugs. They emphasized that Mr. Ivey had no incentive to jeopardize his hard-won parole and urged the DOC to dismiss the charges and release him.

67.     The DOC nevertheless issued a disciplinary ticket against Mr. Ivey, charging him with eight separate offenses arising from his receipt of legal mail, including two in the most serious offense category available. Shortly thereafter, the DOC moved Mr. Ivey from the RHU to the Special Adjustment Unit ("SAU"), a different punitive housing unit focused on substance use disorder and behavior-related programming, which he did not need. In the SAU, Mr. Ivey was permitted only three to four hours out of his cell every day, was unable to attend his college courses, and was forced to take a lower-paying job.

68.     Unbeknownst to Mr. Ivey or Ms. Newman-Polk, the University of Massachusetts Medical School Drugs of Abuse Laboratory had analyzed Ms. Newman-Polk's legal mail on September 18, 2020, and determined that it did not contain any drugs. Nonetheless, on

September 28th, the DOC informed Ms. Newman-Polk that Mr. Ivey was being punished for "receiving mail that *purported* to be legal mail and which is suspected to be K2/Synthetic Cannabinoids" and maintained its punitive measures against Mr. Ivey.

69.     It was not until October 14, 2020, that the DOC dismissed the Disciplinary Report against Mr. Ivey on the basis of the lab results.

70.     Ms. Newman-Polk described her experience in a letter to Commissioner Mici on October 26, 2020: "To say that this experience has been highly upsetting is an understatement. It has had a negative impact on my health and my family, as any accusation against Mr. Ivey was effectively an accusation that I committed a serious criminal offense. Although I did nothing wrong, I felt responsible for Mr. Ivey's circumstances since I was the one who sent the mail."

71.     Due to the punishment imposed on Mr. Ivey by the DOC, Mr. Ivey missed nearly a full semester of college courses, delaying his graduation from the program. Mr. Ivey was traumatized by his confinement in the Restrictive Housing Unit and the Secure Adjustment Unit. The most significant impact on Mr. Ivey's life, however, was the threat to his parole. Mr. Ivey had worked very hard to educate himself and prove he was someone who deserved a chance at parole. He would not have done anything to jeopardize that, and a serious disciplinary offense like the one he was wrongly accused of could have resulted in the parole decision being revoked.

## CLASS ALLEGATIONS

72.     This case qualifies for treatment as a class action under Rule 23 of the Federal Rules of Civil Procedure.

73.     Plaintiffs seek to represent two Classes defined below, pending any modifications necessitated by discovery.

74.     The Recipient Class is defined as:

> All people currently or formerly incarcerated in a Massachusetts DOC facility who were subjected to a Sirchie test.

75.     The Sender Class is defined as:

All people who sent mail to an individual incarcerated in Massachusetts DOC facilities that was subjected to a Sirchie test.

76.　Excluded from each Class are: Sirchie, Premier Biotech, and any entities in which those companies have a controlling interest; any entities in which Sirchie or Premier Biotech's officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of Sirchie or Premier Biotech; any federal, state, or local governmental entities; the Judge and/or jury to whom this case is assigned and any member of the Judge's or jury's immediate family and any other judicial officer or juror assigned to this case; and any attorneys representing Plaintiffs or the Classes in this action.

**A.　Each Class meets the requirements for certification**

77.　The Sender Class and the Recipient Class each meet the requirements for certification under Rule 23 of the Federal Rules of Civil Procedure.

78.　<u>Numerosity</u>. The members of each Class are so numerous that joinder of all members is impracticable. The exact number or identification of members in each Class is presently unknown. On information and belief, each Class includes hundreds of individuals. One indication of the numerosity of each Class are the thousands of Sirchie tests Premier Biotech has sold to the Massachusetts DOC, including more than 1,600 NARK 20023 tests since 2018.

79.　The identity of the Class members is ascertainable and can be determined based on available records maintained by the DOC. On information and belief, the DOC maintains records of its use of Sirchie tests and the punishments it imposes in reliance on those tests. In addition, on information and belief, the DOC routinely contacts legal professionals whose mail has tested positive and keeps an internal record of those conversations.

80.　<u>Predominance of Common Questions of Law and Issues of Fact</u>. There are multiple questions of law and fact common to each Class that will predominate over questions affecting only individual Class members, including, but not limited to:

　　a)　Whether Sirchie's tests produce false positives and/or negatives at rates which render them inappropriate as a basis for punishment or other action by the DOC against the addressee or the legal professional who sent the mail;

15

b) Whether Sirchie negligently produced, marketed, and sold tests with high false positive and false negative rates;

c) Whether Sirchie negligently failed to ensure its training materials conformed to applicable standards;

d) Whether Sirchie negligently trained DOC employees on the use of its tests, including adequate training on the foreseeable harms and misuses of the tests;

e) Whether Sirchie engaged in an unfair or deceptive trade practice in the course of producing, selling, marketing, and providing training on the use of its tests;

f) Whether Premier Biotech negligently sold Sirchie's tests to the DOC, despite their extremely high false positive and negative rates;

g) Whether Premier Biotech engaged in an unfair or deceptive trade practice by selling Sirchie's tests to the DOC, including by failing to provide the required false positive and negative rates associated with those tests; and

h) What damages and injunctive relief should be awarded to redress the harms suffered by each Class.

81.     Defendants' actions are common to all members of each Class.

82.     Typicality. Defendants' conduct caused Plaintiffs to suffer injuries similar to the other members of their respective Classes.

83.     Adequacy. Plaintiffs are adequate representatives of each Class because they have a strong personal investment in the outcome of this litigation and their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs are represented by experienced and competent Class Counsel. Class Counsel intends to prosecute this action vigorously for the benefit of the entire Class. Plaintiffs and Class Counsel can fairly and adequately protect the interests of all of the Members of the Classes.

84.     Superiority. The class action is superior to other available methods for fairly and efficiently adjudicating this controversy because individual litigation of Class members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. There is no foreseeable difficulty in managing this action as a class action and it

provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**COUNT I**

Negligence
On Behalf of the Recipient Class and the Sender Class
Against Defendant Sirchie

85.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

86.     Defendant Sirchie owed a duty to Plaintiffs and the Classes to:

a)  ensure that the Sirchie's tests yielded consistently accurate and reliable results;

b)  clearly warn its users about the high risk of false positives and false negatives resulting from the tests; and

c)  prevent users from foreseeably misusing the tests, including by using the tests on paper samples and by using the tests to impose punishment in the carceral context without awaiting laboratory testing.

87.     Defendant Sirchie owed this duty to Plaintiffs and the Classes because:

a)  Sirchie knew or should have known about the false positive and negative rates resulting from the tests it manufactures for sale;

b)  Sirchie knew or should have known its products were sold for use in prisons, including the DOC;

c)  Sirchie knew or should have known about the need to warn users about the limitations and risks of its products;

d)  Sirchie knew or should have known that the foreseeable uses and misuses of its products would cause considerable harm to the Plaintiffs and the Classes;

e)  Sirchie assumed responsibility for training DOC employees on the use of its tests; and

f)  Sirchie was best situated to prevent the harms resulting from its faulty tests.

88.     Defendant Sirchie breached its duty to Plaintiffs and the Classes by:

a)   Manufacturing and selling faulty products, including the NARK
     20023 test, which was incapable of consistently and accurately
     identifying drugs;

b)   providing false and misleading instructions and training materials
     that failed to warn users about the foreseeable risks of using the
     tests and the high rate of false positives and false negatives for
     those tests; and

c)   failing to train DOC employees on the limitations of Sirchie's tests
     and failing to provide instructions and training that would prevent
     the foreseeable misuses of this test.

89.     As a direct result of Sirchie's unlawful conduct, Plaintiffs and the Classes have
endured foreseeable pain and suffering, mental and emotional distress, humiliation,
embarrassment, loss of liberty, and monetary damages.

## COUNT II
### Negligence
### On Behalf of the Recipient Class and the Sender Class
### Against Defendant Premier Biotech

90.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every
allegation set forth in the preceding paragraphs of this complaint.

91.     Defendant Premier Biotech owed a duty to Plaintiffs and the Classes to sell the
DOC drug testing devices that did not carry an unacceptably high false positive and false
negative rate, including by adhering to the requirement in the DOC's request for bids that the
false positive rate for drug testing products must remain below .05%.

92.     Defendant Premier Biotech owed this duty to Plaintiffs and the Classes because
Defendand Premier Biotech knew or should have known that selling drug testing products with a
high false positive rate to the DOC would foreseeably harm the people subjected to accusations
on the basis of those false positive test results.

93.     At all relevant times, Premier Biotech knew or should have known that Sirchie's
tests, including the NARK 20023 tests, had an unacceptably high false positive rate. Indeed,

pursuant to its contract with the DOC, Premier Biotech agreed to, but did not, provide statements about the incidence of false positive results from Sirchie's tests along with its bid to sell the DOC those products.

94.     Premier Biotech breached its duty to Plaintiffs and the Classes by selling faulty tests to the DOC, and by failing to provide adequate warnings about the tests' limitations and deficiencies.

95.     As a direct result of Premier Biotech's unlawful conduct, Plaintiffs and the Classes have endured foreseeable pain and suffering, mental and emotional distress, humiliation, embarrassment, loss of liberty, and monetary damages.

**COUNT III**
Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A
On Behalf of the Recipient Class and the Sender Class
Against Defendant Sirchie

96.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

97.     At all times relevant to this complaint, Sirchie was engaged in trade or commerce by manuafacturing, marketing, and selling its NARK II tests for profit.

98.     Plaintiffs and the Classes have suffered, and may continue to suffer, injury directly due to Sirchie's unfair or deceptive acts and practices, in violation of Mass. Gen. Laws ch. 93A, § 2.

99.     Sirchie's unfair or deceptive acts or practices include, but are not limited to:

   a) Manufacturing and selling an unreliable and/or defective drug-
      testing product to the DOC with an unacceptably high false
      positive and/or false negative rate;

   b) Failing to provide adequate or complete disclosures and warnings
      along with its field drug tests, including specifically disclosing to
      the DOC the high incidence of false positives generated by Sirchie
      field tests; and

   c) Providing false, misleading, incomplete and/or inadequate
      statements, instructions, and training materials about the
      capabilities of Sirchiefield tests, including but not limited to

Sirchie "NARK" tests, for use by the DOC to "identify" accurately or reliably the presence of drugs, including synthetic cannabinoids.

100.    Sirchie's actions, described herein, were performed willfully and knowingly.

101.    As a direct and foreseeable result of Sirchie's conduct, Plaintiffs and the Classes have incurred significant harm, including pain and suffering, mental and emotional distress, humiliation, embarrassment, loss of liberty, privacy invasions, lost time and effort, and monetary damages in an amount to be determined at trial.

102.    On July 22, 2021, Plaintiffs McKenna and Green, through their counsel, sent Sirchie written demands for relief identifying the claimants and reasonably describing the unfair or deceptive acts or practices committed and the injuries they suffered. A copy of the demand letter is attached hereto as Exhibit A.

103.    The demand letters were sent by certified mail and confirmed delivered on July 26, 2021.

104.    To date, Plaintiffs have received no response from Sirchie to its letters nor any offer of relief from Sirchie.

**COUNT IV**
Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A
On Behalf of the Recipient Class and the Sender Class
Against Defendant Premier Biotech

105.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

106.    At all times relevant to this complaint, Premier Biotech was engaged in trade or commerce by marketing and selling Sirchie's NARK II tests for profit.

107.    Plaintiffs and the Classes have suffered, and may continue to suffer, injury directly due to Premier Biotech's unfair or deceptive acts and practices, in violation of Mass. Gen. Laws ch. 93A, § 2.

108.    Premier Biotech's unfair and deceptive acts or practices include, but are not limited to:

a)    Selling an unreliable and/or defective drug-testing product to the

DOC with an unacceptably high false positive and/or false negative rate;

b) Failing to provide adequate or complete disclosures and warnings along with Sirchie field tests, including failing to specifically disclose to the DOC the high incidence of false positives generated by Sirchie field tests; and

c) Providing false, misleading, incomplete and/or inadequate statements, instructions, and training materials about the capabilities of the Sirchie tests, including but not limited to Sirchie "NARK" tests, for use by the DOC to "identify" accurately or reliably the presence of drugs, including synthetic cannabinoids.

109.    Premier Biotech's actions, described herein, were performed willfully and knowingly.

110.    As a direct and foreseeable result of Premier Biotech's conduct, Plaintiffs and the Classes have incurred significant harm, including pain and suffering, mental and emotional distress, humiliation, embarrassment, loss of liberty, privacy invasions, lost time and effort, and monetary damages in an amount to be determined at trial.

111.    On July 22, 2021, Plaintiffs McKenna and Green, through their counsel, sent Premier Biotech written demands for relief identifying the claimants and reasonably describing the unfair or deceptive acts or practices committed and the injuries they suffered. A copy of the demand letter is attached hereto as Exhibit B.

112.    These demand letters were sent by certified mail and confirmed delivered on July 26, 2021.

113.    To date, Plaintiffs have received no response from Premier Biotech to these letter nor any offer of relief from Premier Biotech.

**Prayer for Relief**

WHEREFORE, Plaintiffs pray that this Court:

A.    Certify this action as a Class Action under Rule 23 and appoint Mr. McKenna, Ms. Newman-Polk, Mr. Ivey, and Mr. Green as representatives of their respective Classes and their attorneys as Class Counsel;

B.      Enter judgment in favor of Plaintiffs and the Classes and against Defendants on each of the Counts stated above;

C.      Permanently enjoin Sirchie and Premier Biotech from engaging in the unfair and deceptive trade practices described herein, including, but not limited to, selling Sirchie's test to carceral or law enforcement agencies in Massachusetts, pursuant to Mass. Gen. Laws ch. 93A, § 9(1);

D.      Award reasonable and just compensatory damages to Plaintiffs and the Classes for the injuries they suffered;

E.      Treble such monetary relief awarded to Plaintiffs, as provided by Mass. Gen. Laws ch. 93A, § 9(3);

F.      Award Plantiffs and the Classes costs and reasonable attorneys' fees, pursuant Mass. Gen. Laws ch. 93A, § 9(4); and

G.      Grant such other further relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all claims so triable.

Dated: October 4, 2021                    Respectfully submitted,

*/s/ Janet Herold*
Janet Herold (BBO No. 632479)
Benjamin Elga (BBO No. 697933)
**Justice Catalyst Law, Inc**.
123 William St., 16th Floor
New York, NY 10038
Tel: (518) 732-6703
jherold@justicecatalyst.org
belga@justicecatalyst.org

Ellen Leonida*
Matthew Borden*
Christman Rice*
Eric Schlabs*
**BraunHagey & Borden LLP**
351 California Street, 10th Floor
San Francisco, CA 94104
Tel. & Fax: (415) 599-0210
leonida@braunhagey.com
borden@braunhagey.com
rice@braunhagey.com
schlabs@braunhagey.com

Max D. Stern (BBO No. 479560)
Lorraine Belostock (BBO No. 692183)
**Todd & Weld LLP**
One Federal Street, 27th Floor
Boston, MA 02110
Tel: (617) 720-2626
mdstern@toddweld.com
lbelostock@toddweld.com

*Attorneys for Plaintiffs Julian Green, Eugene Ivey,
James P. McKenna, and Lisa Newman-Polk and the
Classes*

\* *Pro hac vice* applications pending

## CERTIFICATE OF SERVICE

I, Janet Herold, hereby certify that this document filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 4, 2021.

*/s/ Janet Herold*
Janet Herold (BBO No. 632479)
