## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JULIAN GREEN, EUGENE IVEY, JAMES P. MCKENNA, and LISA NEWMAN-POLK, individually and on behalf of all others similarly situated,<br><br>                  *Plaintiffs*,<br>vs.<br><br>SIRCHIE ACQUISITION CO. LLC, and PREMIER BIOTECH, INC.,<br><br>                  *Defendants*. | Civil Action No. 1:21-cv-11504-GAO |

### PREMIER BIOTECH, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

Defendant Premier Biotech, Inc. ("Premier Biotech"), by and through its undersigned counsel, respectfully submits this Memorandum of Law in Support of its Motion to Dismiss Plaintiffs' Amended Complaint ("Am. Complaint") as to Premier Biotech pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6).

### PRELIMINARY STATEMENT

Premier Biotech is a supplier of drug testing devices that are used by correctional facilities and officers across the country, including supplying to the Massachusetts Department of Correction ("DOC") certain NARK II brand drug detection devices that are manufactured by Defendant Sirchie Acquisition Company, LLC ("Sirchie"). It is not alleged that Premier Biotech produced, manufactured, or had any role in the creation of the NARK II products. Nor is it alleged that Premier Biotech had any role in the utilization of drug detection devices by the DOC, training given to DOC employees, or the penalties given by DOC employees stemming from the use of the devices to test inmates.

## BACKGROUND

Plaintiffs' claims arise from the results of decisions made by DOC members. These decisions were made after receiving allegedly inaccurate results of a number of drug tests conducted by the DOC. The DOC conducted these tests – and made independent decisions based off those tests – using products manufactured by Sirchie. Premier Biotech had nothing to do with the production of the products or the use of those products. Premier Biotech's involvement was limited to acting as a distributor of Sirchie products. Specifically, Premier Biotech acted as the middle-man and supplied the NARK II line of drug testing products from Sirchie to the DOC based on a contract entered into between Premier Biotech and the DOC in or around 2017. (Am. Complaint, at ¶ 29.) The NARK II products are intended to be used for the "presumptive identification" of certain drugs. (Am. Complaint, at ¶ 15.) As "presumptive identification" tests, the tests are not intended to be used as conclusive evidence of the presence of drugs. Premier Biotech submitted a bid to the DOC and the DOC accepted it. (Am. Complaint, at ¶ 29.)

As part of its bid, Premier Biotech provided the DOC with marketing material relating to Sirchie and the NARK product line. These documents were referenced and relied on by Plaintiffs in the Amended Complaint (at ¶¶ 27, 30), so they may be relied on by the Court in deciding the Motion to Dismiss. *Cruz v. Melecio*, 204 F.3d 14, 21 - 22 (1st Cir. 2000) (any document fairly incorporated into Complaint may be considered on Motion to Dismiss). Premier Biotech explicitly instructs all purchasers of the Sirchie products – including the DOC – to **not** rely on presumptive test results for conclusive proof of the presence of narcotics. (*See* Dckt. # 14, Affidavit of Matthew Michalik dated September 10, 2021 (hereinafter "Michalik Aff."), ¶ 7; Dckt. #14-1, Michalik Aff. Ex. A, p. 5). The materials related to Sirchie and the NARK products provided to the DOC further

stated that the NARK II products may result in the occurrence of false positives and false negatives, and that "[a] forensic laboratory is required to qualitatively and quantitatively identify an unknown substance." (*Id*. (emphasis added)).  This same warning appears on all of the Sirchie and NARK-related promotional materials. (*See* Dckt. #14-2, Michalik Aff. Ex. B, p. 1; Dckt. #14-3, Michalik Aff. Ex. C, p. 2).  The DOC accepted Premier Biotech's bid to supply Sirchie's NARK tests after being provided with such warnings about the possibility for false test results and the direction to confirm tests with laboratory testing.  Premier Biotech's contract for the supply of NARK II products is with the DOC alone. (Am. Complaint, at ¶ 29.)

Sometime after 2017, Plaintiffs allege that the DOC used the NARK II products to issue tests to pieces of mail sent to Eugene Ivey and Julian Green.  (Am. Complaint, at ¶ 4.)  Plaintiffs allege that the NARK II products returned positive results and that the DOC and its employees punished Ivey and Green without obtaining laboratory confirmation of the positive test results. (Am. Complaint, at ¶¶ 52-58, 64-68.)  Plaintiffs do not allege that Premier Biotech took part in any of the specific tests at issue, nor was Premier Biotech part of any of the disciplinary decisions allegedly levied against Plaintiffs.  Nonetheless, Plaintiffs filed their original class action Complaint on July 28, 2021, alleging that Premier Biotech owed duties to Plaintiffs and the purported Plaintiff Classes as a result of Premier Biotech's contractual agreement with the DOC. The Amended Complaint alleges two claims against Premier Biotech:  negligence (Count II) and a violation of G.L. c. 93A (Count IV).  For the reasons stated below, these claims fail as a matter of law for failure to state a claim and for lack of standing.

## **LAW AND ARGUMENT**

### I. **Legal Standard.**

#### A. **Fed. R. Civ. P. 12(b)(1)**

Under Rule 12(b)(1), a defendant may challenge a plaintiff's ability to bring an action due to a lack of Article III standing. Every plaintiff must have standing to bring each claim that they assert. *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012); *Pagan v. Calderon*, 448 F.3 16, 26 (1st Cir. 2006). The burden of providing standing belongs to the plaintiff. Each plaintiff must prove the existence of three elements: (1) that the specific plaintiff suffered an injury; (2) there is a causal connection between the plaintiff's injury and the defendant's action; and (3) there is a likelihood that the injury can be remedied by a ruling in the plaintiff's favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992); *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To establish an injury, a plaintiff must show "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 *quoting Lujan*, 504 U.S. at 560; *Benjamin v. Aroostook Med. Ctr., Inc.*, 57 F.3d 101, 104 (1st Cir. 1995).

#### B. **Fed. R. Civ. P. 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) authorizes a defendant to move to dismiss an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must assert a "plausible" claim and contain "sufficient factual matter" to support it. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "But where the well-pleaded facts do not

permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679, quoting Fed. R. Civ. P. 8(a)(2).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, when accepting all factual allegations in the plaintiffs' complaint as true, a court need not "accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. A dismissal for failure to state a claim pursuant to Rule 12(b)(6) is appropriate if, the "[f]actual allegations [are not] enough to raise a right to relief above the speculative level, … on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted). In evaluating a motion to dismiss, "[t]he jurisprudence of Rule 12(b)(6) requires [a district court] to consider not only the complaint, but also matters fairly incorporated within it and matters susceptible to judicial notice." *Cruz*, 204 F.3d at 21-22, citing *Beddall v. State St. Bank Trust Co.*, 137 F.3d 12, 16 - 17 (1st Cir. 1998).

## II. The Attorney Plaintiffs Lack Article III Standing[1]

Plaintiffs McKenna and Newman-Polk ("Attorney Plaintiffs") fail to allege any injury. Neither of them allege that they suffered anything more than threats to be punished, and neither were prevented from sending mail to their clients. *See* Am. Complaint, ¶¶ 4, 43, 70. The real focus of the Attorney Plaintiffs' alleged damages are actually damages suffered by Green and Ivey. *See* Am. Complaint, ¶¶ 4, 44, 46, 49, 63, 66-71. Because the Attorney Plaintiffs do not allege any injury to themselves, they cannot sue a middle-man distributer on the basis that the DOC – a third

---

[1] In addition to the arguments made herein, Premier Biotech joins in the arguments relating to the standing of the Attorney Plaintiffs made in Defendant Sirchie's Memorandum in Support of Sirchie's Motion to Dismiss.

party – threatened to take future action against the Attorney Plaintiffs. *Spokeo*, 136 S. Ct. at 1548, *quoting Lujan*, 504 U.S. at 560 (a plaintiff's alleged injury must be concrete and particularized and actual or imminent, not conjectural or hypothetical).

Furthermore, the Attorney Plaintiffs lack a causal link between their purported harm and Premier Biotech's actions because Premier Biotech did not contract with the Attorney Plaintiffs nor communicate or promise anything to Plaintiffs in any way. Premier Biotech was not involved in any of the DOC's decisions based on their use of Sirchie's testing products.. As a result, Premier Biotech had no control over the DOC's actions against the Attorney Plaintiffs (or their clients). *Katz*, 672 F.3d at 71; *citing Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) (causation does not exist if alleged harm was caused by third party).

Thus, the Attorney Plaintiffs lack standing to bring any claims against Premier Biotech.

### III. Plaintiffs Fail to State a Claim for Negligence Against Premier Biotech.

Under Massachusetts law, to establish a claim for negligence a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff; (2) a breach of such duty; and (3) injury to the plaintiff caused by the defendant's breach. *Glidden v. Maglio*, 430 Mass. 694, 696 (2000); *see also* Restatement (Second) of Torts, § 281 (1965). A negligence allegation cannot stand unless it shows "the existence of an act or omission in violation of a duty owed to the plaintiff by the defendant." *See Cottam v. CVS Pharmacy*, 436 Mass. 316, 320 (2002), *quoting Dinsky v. Framingham*, 386 Mass. 801, 804 (1982); *Westerback v. Harold F. LeClair Co., Inc.*, 50 Mass. App. Ct. 144, 146 (2000); *see also Glidden*, 430 Mass. at 696 (causation is an essential element of proof in a negligence claim). "Before liability for negligence can be imposed, there must first be a legal duty owed by the defendant to the plaintiff and a breach of that duty proximately resulting

6

in the injury." *Davis v. Westwood Group*, 420 Mass. 739, 742-43 (1995). The existence of a duty is a question of law for the Court to decide. *Cottam v. CVS Pharmacy*, 436 Mass. 316 (2002).

### A. The Amended Complaint fails to state a claim because it does not plausibly allege that Plaintiffs' alleged harm was caused by Premier Biotech.

Plaintiffs' negligence allegation fails because Plaintiffs do not allege that their harm was caused by Premier Biotech. To prevail on their claim, Plaintiffs ultimately must prove that the alleged negligence of Premier Biotech – i.e. supplying products with an allegedly high false result rate – was the proximate cause of Plaintiffs' harm. *See Delaney v. Reynolds*, 63 Mass. App. Ct. 239, 241 (2005). Yet even if Plaintiffs alleged as such (they have not), the negligence claim must be dismissed because the harm alleged by Plaintiffs is plainly the result of intervening actions taken by the DOC and its employees.

For example, the Amended Complaint (at ¶ 3) states that it is the DOC that "imposes severe and immediate punishments on the recipient of the tested mail." Further, the Amended Complaint alleges (at ¶ 33) that it is the DOC that "has been using Sirchie's tests on legal mail and relying on false positives to punish incarcerated people." Similar allegations detailing the role of the DOC and its employees litter the Amended Complaint. (*See* Am. Complaint, ¶¶ 34, 44-45, 53, 55-56, 63-65, 67.) The Amended Complaint goes to great lengths to describe the actions taken by the DOC and its employees to punish Plaintiffs – actions with which Premier Biotech had no involvement. In fact, after this action was removed to Federal Court, the Plaintiffs filed their Amended Complaint removing the DOC from this action but re-filing a new action against the DOC and its commissioner, Carol Mici, in the Suffolk Superior Court (the "DOC Complaint").[2] The DOC Complaint is attached hereto as Exhibit A. The allegations in the DOC Complaint make clear that the alleged harm is caused by the intervening acts of the DOC:

---

[2] Notably, the Attorney Plaintiffs are *no*t Plaintiffs in the DOC Complaint.

- "[T]he DOC presents the incarcerated person with an untenable dilemma: they can either accept responsibility for a crime they did not commit and suffer the punishment; or they can request a laboratory test—but be subjected to solitary confinement and loss of privileges while the DOC waits for the test results, which can often take months." (DOC Compl., ¶ 2);

- "The DOC's practice of arbitrarily punishing innocent people based on test results it knows are unreliable is unnecessary and serves no legitimate penological interest.  By simply waiting to impose consequences until after a laboratory test has been done, the DOC could avoid this problem, without sacrificing its ability to penalize people who are actually bringing drugs into its facilities."  (DOC Compl., ¶ 3);

- "The DOC's unlawful practice is causing immediate and irreparable harm." (DOC Compl., ¶ 4);

- "[A]t the direction or under the supervision of Commissioner Mici, the DOC attempts to dissuade incarcerated people from seeking to have their mail evaluated by laboratory testing by threatening that they will be required to pay for that testing. The DOC actively punishes incarcerated people both before they are given the opportunity to request laboratory testing and while waiting for the results of the laboratory tests—which often takes weeks or months. The DOC uses this time and threat of expense to try to coerce people into admitting the charges the DOC brought against them based on NARK 20023 test results." (DOC Compl., ¶ 35).

The allegations against the DOC establish that the alleged harm is caused by the DOC's practices and actions – not Premier Biotech's.  Indeed, the allegations show the DOC ignores the clear warnings on Sirchie's products that the NARK 20023 tests reveal "presumptive" positive results and that any test should be confirmed by a laboratory prior to making any decisions based on the presumptive test result.

The DOC Complaint goes further in establishing that there was no harm committed by Premier Biotech against the Plaintiffs.  As alleged in the DOC Complaint (at ¶ 66), the DOC had laboratory proof that the mail sent to Plaintiff Ivey did not contain any drugs, yet the DOC punished Plaintiff Ivey anyway for "receiving mail that purported to be legal mail and which is suspected to be K2/Synthetic Cannabinoids."  That decision is completely within the control of the DOC and one with which Premier Biotech has no connection whatsoever.

8

Further, the Amended Complaint admits that there are ways to avoid negative consequences for allegedly false positive results, acknowledging that the potential false results themselves are not harmful. For instance, Plaintiffs acknowledge that inmates (or the DOC, for that matter) may have the purported false positives evaluated using laboratory testing. (Am. Complaint, at ¶ 49.) Having the Sirchie test results evaluated by laboratory testing is exactly what Premier Biotech instructs all purchasers of the Sirchie products to do. Premier Biotech makes clear that the DOC is *not* supposed to rely on test results for conclusive proof of the presence of narcotics. (*See* Dckt. #14-1, Michalik Aff. Ex. A, p. 5)[3] Premier Biotech also tells buyers that the NARK II tests specifically could result in false positives and false negatives, and that "[a] forensic laboratory is *required* to qualitatively and quantitatively identify an unknown substance." (*Id.* (emphasis added)) This same warning appears on all of Premier Biotech's NARK-related promotional materials. (*See Id.*, Ex. B, pg. 1; *Id.*, Ex. C, pg. 2). Consistent with such a position, other courts have determined that laboratories are in the best position to prevent harm related to false test results. *See Landon v. Kroll Lab. Specialists, Inc.*, 22 N.Y.3d 1 (2013); *Shaw v. Psychmedics Corp.*, 426 S.C. 194, 199 (2019). That makes sense. Premier Biotech, however, is not a laboratory and did not conduct the tests complained of in the Amended Complaint nor manufacture the products used for the tests.

Premier Biotech cannot control whether or not Sirchie purchasers, such as the DOC, follow the clear instructions included in the promotional material. Indeed, because the DOC and its employees apparently chose not to follow Premier Biotech's own warning and rely on preliminary test results to implement punishments without obtaining confirmation from laboratory results, the

---

[3] The Exhibits identified in the Michalik Affidavit are referenced and relied on by Plaintiffs in their Amended Complaint. Specifically, at ¶ 27, Plaintiffs specifically reference Premier Biotech's promotional material regarding the NARK 20023 tests. Thus, they may considered for purposes of this Motion to Dismiss. *Cruz v. Melecio*, 204 F.3d 14, 21-22 (1st Cir. 2000).

9

resulting harm to the Plaintiffs and the proposed Classes could not have been caused by Premier Biotech. The Plaintiffs' Amended Complaint implicitly acknowledges this reality as well. Plaintiffs allege (at Am. Complaint ¶ 15) that the Sirchie NARK tests reveal "presumptive" results. The very nature of the tests as revealing "presumptive" results directly reflects that the results are not to be relied upon as definitive or conclusive.

In addition to being the cause in fact of the injury, the plaintiff must show that Premier Biotech's allegedly negligent conduct was a proximate or legal cause of the injury as well. "[O]ne cannot be held liable for negligent conduct unless it is causally related to injury of the plaintiff." *Wainwright v. Jackson*, 291 Mass. 100, 102 (1935); *Glidden v. Maglio*, 430 Mass. 694, 696 (2000) (causation "is an essential element" of proof of negligence). Whether negligent conduct is the proximate cause of an injury depends on whether the injury to the plaintiff was a foreseeable result of the defendant's negligent conduct. *Jesionek v. Massachusetts Port Auth.*, 376 Mass. 101, 105 (1978). The DOC employee actions instituting punishment based solely on the NARK products – when Premier Biotech expressly states that the products require forensic laboratory confirmation – are intervening causes that were not reasonably foreseeable to Premier Biotech. It is not reasonably foreseeable that the DOC and its employees would ignore the NARK products disclosures and implement punishment based on NARK test results without confirming results with laboratory tests.

The mere fact that the DOC controlled the NARK tests and implemented the testing procedures alleviates Premier Biotech of any responsibility for the results of the tests. The DOC assumed control of the NARK products and thereby assumed the responsibilities of administering the tests. Premier Biotech never had such responsibilities, and to the extent there were any obligations of Premier Biotech relating to the administration of the tests, such obligations were

eliminated when the DOC took exclusive possession of the testing products. Because any duty relating to the NARK tests was transferred to the DOC, a law enforcement agency that could reasonably be relied on to perform its responsibilities, the element of proximate cause as to Premier Biotech was extinguished. The subsequent actions by the DOC thus relieve Premier Biotech of any liability. Restatement (Second) of Torts § 452(2) ("where . . . the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause").

Premier Biotech had no involvement with the testing, analysis, interpretation of results, or resulting punishments of inmates issued by the DOC. It was the DOC's decisions that subjected Plaintiffs to their purported harm. Since the DOC's actions constitute intervening harm, the negligence claim against Premier Biotech should be dismissed.

### B. The Amended Complaint fails to state a claim because it does not plausibly allege that Premier Biotech breached a duty owed directly to Plaintiffs.

It is well-accepted that each Plaintiff, individually and on behalf of the purported classes, must allege and demonstrate that Premier Biotech owed each a duty of care in order to have an actionable claim for negligence. *Lev v. Beverly Enterprises-Mass. Inc.*, 457 Mass. 234, 240 (2010) (absent a legal duty owed by defendant, there is no actionable claim for negligence).

Plaintiffs' negligence allegation against Premier Biotech is premised solely on the sale of presumptive testing products to the DOC that were allegedly defective. The relevant claims against Premier Biotech are detailed in paragraphs 128-131:

- ¶ 91: "Defendant Premier Biotech owed a duty to Plaintiffs and the Classes *to sell the DOC* drug testing devices . . . including *by adhering to the requirement in the DOC's request for bids* that the false positive rate for drug testing products must remain below .05%." (emphasis added)

- ¶ 92: "Defendant Premier Biotech owed this duty to Plaintiffs and the Classes because Defendan[t] Premier Biotech knew or should have known

11

that *selling drug testing products* with a high false positive rate to the DOC . . ." (emphasis added)

- ¶ 93: "Indeed, *pursuant to its contract with the DOC*, Premier Biotech agreed to, but did not, provide statements about the incidence of false positive results from Sirchie's tests along with its bid to sell the DOC those products." (emphasis added)

- ¶ 94: "Premier Biotech breached its duty to Plaintiffs and the Classes *by selling faulty tests to the DOC* . . . ." (emphasis added)

Plaintiffs further establish that Premier Biotech's only alleged liability is based on the contractual relationship with the DOC in their class allegations. Specifically, Plaintiffs claim that the only question of law and fact common to each Class that relates to Premier Biotech is: "Whether Premier Biotech *negligently sold* Sirchie's tests to the DOC, despite their extremely high false positive and negative rates." (Am. Complaint, at ¶ 80.)

Each of Plaintiffs' claims against Premier Biotech relate explicitly to Premier Biotech's contract with the DOC and allege liability against Premier Biotech solely as a result of that contract. But any alleged contract between Premier Biotech and the DOC does not save Plaintiffs' claims in this instance, because a contract with a separate entity does not create a duty of care for tort law purposes as to non-signatories where there is no additional independent duty of care. S*ee Anderson v. Fox Hill Vill. Homeowners Corp.*, 424 Mass. 365, 368 (1997) ("failure to perform a contractual obligation is not a tort in the absence of a duty to act apart from the promise made"); *Goulart v. Canton Hous. Auth*., 57 Mass. App. Ct. 440, 445 (2003) ("Even breach of a contractual obligation . . . does not create a duty in tort.").[4]

---

[4] In addition, Plaintiffs cannot claim that they were somehow third-party beneficiaries of the contract between Premier Biotech and the DOC. That contract was for a sale of goods. (Am. Complaint, at ¶ 29.) While Plaintiffs may be impacted by the use of such goods by the DOC, it is not alleged that the specific Plaintiffs were identified by the Premier Biotech contract and that the Plaintiffs were specifically intended to be beneficiaries of the sale of the goods. *See Anderson v. Fox Hill Vill. Homeowners Corp.* 424 Mass. 365, 366-367 (1997) (there must be explicit or implied intent of the contracting parties to give plaintiffs "the benefit of the promised performance").

Nor, as discussed below, is Premier Biotech responsible for the actions of the DOC and its employees. It is well-established in Massachusetts "that there is no duty to control another person's conduct to prevent that person from causing harm to a third party." *Leavitt v. Brockton Hosp., Inc.*, 454 Mass. 37, 40–41 (2009); Restatement (Second) of Torts § 315. The recognized exceptions to this general rule are employer-host liability or when there exists a "special relationship" between the plaintiff and defendant. *Lev*, 457 Mass. at 236. No exception applies to the relationship between Premier Biotech and the Plaintiffs here. Thus, there can be no duty imputed to Premier Biotech for actions taken by the DOC or its employees as a result of the tests. Simply put, even if the Sirchie tests that Premier Biotech sold the DOC did not work as alleged by Plaintiffs, this failure *did not harm Plaintiffs*; rather, the independent actions of the DOC harmed Plaintiffs. Premier Biotech is not alleged to have actually done anything to Plaintiffs.

### C. The Amended Complaint fails to state a claim because it does not plausibly allege that Premier Biotech violated c. 93A.

To make a claim for a violation of Massachusetts' consumer protection laws, c. 93A, a plaintiff must establish that the defendant utilized an unfair or deceptive act. *Mechanics Nat'l Bank v. Killeen*, 377 Mass. 100 (1979). "The circumstances of each case must be analyzed, and unfairness is to be measured not simply by determining whether particular conduct is lawful [or unlawful…] apart from G. L. c. 93A but also by analyzing the effect of the conduct on the public [or the consumer]." *Id.*, quoting *Schubach v. Household Fin. Corp.*, 375 Mass. 133 (1978). "In the absence of conduct that qualifies as unfair or deceptive, a negligent act or acts, alone, do not violate c. 93A." *Klairmont v. Gainsboro Rest., Inc.*, 465 Mass. 165, 176-177 (2013); *Darviris v. Petros*, 442 Mass. 274, 278 (2004) ("a violation of G. L. c. 93A requires, at the very least, more than a finding of mere negligence"); *Meyer v. Wagner*, 429 Mass. 410, 423-424 (1999) (no unfair or deceptive act where only negligence alleged).

13

Here, Plaintiffs have not alleged anything more than mere negligence. *See* Am. Complaint, ¶¶ 108-110. Plaintiffs' claim of a violation of c. 93A therefore fails. *Klairmonti*, 465 Mass. at 176-177 ("In the absence of conduct that qualifies as unfair or deceptive, a negligent act or acts, alone, do not violate c. 93A."); *Darviris*, 442 Mass. at 278 ("a violation of G. L. c. 93A requires, at the very least, more than a finding of mere negligence"). There is no evidence that Premier Biotech misrepresented the capabilities of Sirchie's NARK II Test Kit. Indeed, Sirchie included warnings to all consumers (whom are not individual citizens but state entities) and Premier Biotech reiterated them in its own communications, about the presumptive nature of the NARK II Test Kit and that any results from such tests need to be confirmed by a laboratory. Accordingly, Premier Biotech did not partake in any unfair or defective practices and, as Plaintiffs' claims against Premier Biotech are predicated on mere negligence allegations, a violation of c. 93A fails as a matter of law.

Furthermore, Massachusetts courts have established that whether a given practice is "unfair," and therefore prohibited by 93A, depends on the effect of the challenged conduct on the public or the consumer. *See Killeen*, 384 N.E.2d at 1231; *Schubach v. Household Fin. Corp.*, 376 N.E.2d 140, 142 (Mass. 1978). In *Slaney v. Westwood Auto, Inc.*, for example, the Supreme Judicial Court of Massachusetts held that the remedies in 93A are only "available to the individual consumer or businessman . . .who suffers a loss, in the case of the consumer as a result of the employment of an unfair or deceptive act or practice by a businessman, or in the case of a businessman, as a result of the employment of another businessman of either an unfair or deceptive act or practice of an unfair method of competition." 322 N.E.2d 769, 774 (Mass. 1975). Thus, Plaintiffs fail to state a claim under 93A because they have not alleged – and cannot allege – that they are consumers vis-à-vis Premier Biotech. Premier Biotech's contract was with the DOC and

the DOC alone. How the DOC uses the product it obtains as a result of that contract is out of Premier Biotech's control, and forecloses any ability for Plaintiffs to maintain a 93A claim against Premier Biotech.

Because the Amended Complaint is devoid of any allegations that Premier Biotech owes an independent duty to any of the Plaintiffs, the Court should dismiss Count IV of the Amended Complaint for failure to state a claim on which relief can be granted.

## CONCLUSION

Plaintiffs have failed to plausibly allege any theory of negligence or a violation of c. 93A against Premier Biotech. On the contrary, Plaintiffs' allegations in the Amended Complaint establish that Premier Biotech had a contractual agreement with the DOC that did not bestow a duty on Premier Biotech in relation to numerous unknown inmates and potential inmates across Massachusetts. There can be no negligence when Premier Biotech owes no duty to Plaintiffs in the first place. Likewise, Plaintiffs' Amended Complaint alleges no fact sufficient to show that Premier Biotech had any role in the manufacturing, administration, use, or disciplinary decisions stemming from the DOC's use of the products at issue, and therefore there can be no logical basis to allege that Premier Biotech caused any harm to the Plaintiffs at all. Further, the Attorney Plaintiffs do not have standing to pursue their claims. For the foregoing reasons, Premier Biotech respectfully requests that Counts II and IV of Plaintiffs' Amended Complaint be dismissed, with prejudice.

Dated: October 18, 2021					WINTHROP & WEINSTINE, P.A.

*s/ Joseph M. Windler*_____
Joseph M. Windler, #0387758 (MN)
jwindler@winthrop.com
*Admitted Pro Hac Vice*
Devon C. Holstad, #559221 (NY)
dholstad@winthrop.com
*Admitted Pro Hac Vice*
225 South Sixth Street Suite 3500
Minneapolis, Minnesota 55402
(612) 604-6400

and

Shepard Davidson (BBO#557082)
sdavidson@burnslev.com
Michael A. DeIulis (BBO#691495)
mdeiulis@burnslev.com
BURNS & LEVINSON LLP
125 High Street
Boston, MA 02110
(617) 345-3000

*Attorneys for Defendant*
*Premier Biotech, Inc.*

.
.

## **CERTIFICATE OF SERVICE**

I, Joseph M. Windler, hereby certify that this document filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 18, 2021.

*s/ Joseph M. Windler*
Joseph M. Windler, #0387758 (MN)
*Admitted Pro Hac Vice*
