Exhibit A

## COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                                    Suffolk Superior Court
                                                               Trial Court Department

JULIAN GREEN and EUGENE IVEY,
individually and on behalf of all others
similarly situated,

     *Plaintiffs,*

*v.*

MASSACHUSETTS DEPARTMENT OF
CORRECTION and CAROL MICI,
Commissioner of the Massachusetts
Department of Correction, in her official
capacity,

     *Defendants.*

*10/5/2021*

Docket No:

**CLASS COMPLAINT FOR
VIOLATIONS OF:**

   **(1) Massachusetts Civil Rights Act,
       Mass. Gen. Laws ch. 12, § 11I;**
   **(2) Massachusetts Declaratory
       Judgment Act, Mass. Gen. Laws ch.
       231A, §1**

**JURY TRIAL and INJUNCTIVE RELIEF
REQUESTED**

Plaintiffs Julian Green and Eugene Ivey, on behalf of themselves and those similarly situated, allege as follows:

**<u>INTRODUCTION</u>**

1.      Defendant Massachusetts Department of Correction (the "DOC") uses fake drug tests on legal mail to interfere with incarcerated people's right to communicate with their counsel and punish them without due process. One test, the NARK 20023, purports to be able to detect synthetic cannabinoids. When used to test for drugs sprayed on paper (such as legal mail), however, the NARK 20023 is less accurate than witchcraft, phrenology, or simply picking a number out of a hat. Interactions with innocuous chemicals commonly found in paper frequently create false positives—almost 80% of the time, according to one DOC official's estimate.

2.      Once a false positive has been generated, the DOC presents the incarcerated person with an untenable dilemma: they can either accept responsibility for a crime they did not commit and suffer the punishment; or they can request a laboratory test—but be subjected to solitary confinement and loss of privileges while the DOC waits for the test results, which can often take months. Moreover, the DOC threatens to impose significant fines and expenses on any person whose laboratory testing comes back positive, including by forcing the person to pay for such tests—further coercing incarcerated people into confessing to crimes they did not commit in order to escape the threat of crushing punishment.

3.      The DOC's practice of arbitrarily punishing innocent people based on test results it knows are unreliable is unnecessary and serves no legitimate penological interest. By simply waiting to impose consequences until after a laboratory test has been done, the DOC could avoid this problem, without sacrificing its ability to penalize people who are actually bringing drugs into it facilities. The DOC could easily quarantine any suspected mail pending the outcome of a laboratory test—and the purported offender would not be able to escape liability since they are already under the DOC's control.

4.     The DOC's unlawful practice is causing immediate and irreparable harm. Many incarcerated people are now refusing legal mail—their main form of communication with their (often Court-appointed) counsel during the pandemic—rather than risk being subjected to this arbitrary and unconstitutional process. And incarcerated people who do risk accepting legal mail are being subjected to solitary confinement and loss of privileges, such as educational and vocational training, based on the false positives generated by the DOC's use of the NARK 20023.

5.     Plaintiff Eugene Ivey was formerly incarcerated by the DOC, and Plaintiff Julian Green continues to be incarcerated by the DOC. Both were falsely accused and punished by the DOC based on the DOC's faulty test. Plaintiffs bring this case on behalf of themselves and all similarly situated people to redress Defendants' unconstitutional and illegal conduct.

## JURISDICTION AND VENUE

6.     This Court has subject-matter jurisdiction over this case pursuant to its general jurisdiction under Massachusetts General Laws chapter 212, § 4.

7.     This Court has personal jurisdiction over Defendant Massachusetts Department of Correction because it is an agency of the Commonwealth of Massachusetts. The Court has personal jurisdiction over Defendant Carol Mici because she is an employee of the Commonwealth of Massachusetts and because she is charged, by statute, with the responsibility for overseeing the administration of all state correctional facilities in the Commonwealth.

8.     This Court has personal jurisdiction over Plaintiffs pursuant to Mass. Gen. Laws ch. 223, § 3(g) because they are domiciled in the Commonwealth of Massachusetts.

9.     This Court is a proper venue pursuant to Mass. Gen. Laws ch. 223, § 1.

## PARTIES

10.    **Plaintiff Julian Green** is a citizen of the Commonwealth of Massachusetts. He is currently incarcerated at MCI-Norfolk. Mr. Green has been incarcerated for fourteen years. While in custody, Mr. Green has taken every opportunity to advance his education, even taking

college classes at Boston University. He also runs a program called the Young Men's Committee, which plans events and brings outside speakers into the prison.

11.     **Plaintiff Eugene Ivey** is a citizen of the Commonwealth of Massachusetts. He was incarcerated at the DOC's Northeastern Correctional Center in Concord until August 19, 2021, when he was released on parole. He currently resides in Suffolk County. Mr. Ivey was sentenced to life in prison with the possibility of parole when he was seventeen years old, and was incarcerated for twenty-six years. During that time, Mr. Ivey made every effort to rehabilitate himself by participating in extensive programming, including taking courses in the Tufts University Prison Initiative of Tisch College. On March 26, 2020, the Massachusetts Parole Board recognized Mr. Ivey's accomplishments and granted him parole by unanimous vote, observing that Mr. Ivey "has fully invested in his rehabilitation."

12.     **Defendant Massachusetts Department of Correction** is an agency of the Commonwealth of Massachusetts responsible for overseeing the Massachusetts prison system. The DOC manages 16 institutions and oversees approximately 8,000 incarcerated people throughout the Commonwealth. The DOC has a place of business in Suffolk County.

13.     **Defendant Carol Mici** is the Commissioner of the Massachusetts Department of Correction. By statute, Defendant Mici is responsible for the administration of all state correctional facilities in Massachusetts. *See* Mass. Gen. Laws ch. 124, § 1. Defendant Mici's responsibilities include overseeing the operations and personnel of the DOC statewide, including DOC facilities and personnel in Suffolk County. Plaintiffs sue Defendant Mici in her official capacity.

**FACTS**

A.      **The DOC Uses Faulty Presumptive Drug Tests on Legal Mail**

14.     The DOC uses faulty drug tests on incoming mail that Massachusetts defense attorneys send to their incarcerated clients at DOC facilities.

15.     Among the tests the DOC routinely uses on legal mail is the NARK 20023 made by Sirchie Acquisition, LLC ("Sirchie"). Sirchie markets this test as able to presumptively detect eight types of synthetic cannabinoids. "Synthetic cannabinoids" is a catch-all term used to refer to hundreds of human-made chemicals designed to simulate tetrahydrocannabinol, the primary active ingredient in marijuana. Synthetic cannabinoids can be sprayed onto plant matter or paper, which can then be smoked.

16.     The NARK 20023 cannot reliably identify synthetic cannabinoids.

17.     The NARK 20023 yields false positives at rates so high that its results are worse than random. In fact, Sirchie acknowledged these issues before it began selling its NARK 20023 tests. In October of 2012, Sirchie issued a "NARK News" brochure acknowledging that the unique features of synthetic cannabinoids "make[] it almost impossible" to develop a "field test that will not have too many unacceptable false positives." Although none of the "unique features" that make a reliable test for synthetic cannabinoids "nearly impossible" have changed, Sirchie was manufacturing and marketing its NARK 20023 test by 2013.

18.     DOC employees are aware that the NARK 20023 generates a high rate of false positives. A DOC employee advised an attorney whose mail to an incarcerated client returned a "positive" result that she believed the tests produced false positives up to 80% of the time. Another DOC employee specifically reached out to the DOC's vendor with concerns about the reliability of the NARK 20023 tests after another jurisdiction publicly announced that it would no longer be using the tests to impose punishment in a carceral setting.

19.     Between July 2019 and March 2021, the DOC received information that laboratory testing by the University of Massachusetts Drugs of Abuse Laboratory revealed that at least 122 positive results from tests performed by the DOC with the NARK 20023 were false positives for synthetic cannabinoids.

20.     In addition to yielding an unacceptably high rate of false positive results, the NARK 20023 is also broadly underinclusive: it cannot identify most synthetic cannabinoids in circulation today, including those most commonly identified in the DOC.

21.     The NARK 20023 is capable of identifying only eight specific synthetic cannabinoid formulas—out of the hundreds of synthetic cannabinoid formulas in circulation. These eight formulas have been the same since at least July 2013.

22.     According to data collected by the National Forensic Laboratory Information System ("NFLIS"), most synthetic cannabinoids found in the market in the last five years would not be detected by the NARK 20023—even assuming it worked as advertised. According to NFLIS's data, the specific formulas the NARK 20023 purports to identify are now outdated and rarely, if ever, found in circulation at DOC facilities today.

23.     The NFLIS data is consistent with reports coming out of the DOC itself. During eighteen months of testing samples identified by the DOC as potentially including synthetic cannabinoids, the University of Massachusetts Drugs of Abuse Laboratory did not once identify any of the eight synthetic cannabinoid formulas which the NARK 20023 purports to be able to detect.

**B.     The DOC Imposes Punishment Based on the Results of Tests It Knows Are Unreliable**

24.     Despite the fact that the NARK 20023 is unreliable and unsuited to the meaningful identification of synthetic cannabinoids, the DOC, under the supervision or at the direction of Commissioner Mici, uses the NARK 20023 throughout its facilities. Among other things, the DOC uses the NARK 20023 on incoming legal mail, purportedly to identify drugs sent into DOC facilities. When the tests return positive results—as they often do, regardless of whether drugs are present in or on the mail—the DOC imposes immediate punishment on the addressee.

25.     The DOC's imposition of *any* punishment on incarcerated people in reliance on the NARK 20023 is a violation of the fundamental rights guaranteed by the Massachusetts Constitution.

26.     Moreover, the DOC's reliance on those tests furthers no legitimate goal or policy of the Commonwealth. Even assuming that wrongdoers were sending legal mail containing drugs into DOC facilities, the NARK 20023 cannot reliably identify the drugs for which it purports to test—resulting in an (assumed) inflow of drugs that is unimpeded by the DOC's use of the NARK 20023.

   **1. The DOC Is Using the NARK 20023 In Violation of its Own Quality Control Requirements**

27.     In 2017, the DOC solicited bids for "products that detect drugs of abuse at all of [the DOC's] institutions." The DOC's solicitation imposed specific requirements, including that the products "meet all legal standards that relate to the legal validity of the tests when the tests are being used as a screening test for alcohol or illicit drug use" and that "screening/testing devices shall be as sensitive as possible." The DOC also required the bidder to "provide documentation establishing the accuracy of the screening/testing devices, based on clinical test results," to "identify all substances the screening/testing device will not detect, or will not produce a positive result for the categories of drugs identified above," and to "identify all substances known to cross-react, yielding a potentially false-positive result."

28.     The DOC also established a minimum threshold for "Product Reliability," requiring that "[f]alse positives shall not exceed .05%," noting that the DOC "will monitor false positives" and that "[f]alse positives between .05% and 10% may be grounds for termination of a Contractor's contract." The DOC specifically stated that "[f]alse positives exceeding 10% will result in contract termination."

29.     According to records produced by the DOC in response to a public records request, since at least July 2019, the DOC has been receiving information from the University of Massachusetts Drugs of Abuse Laboratory identifying false positive test results produced by

NARK 20023 tests administered at DOC facilities. The number of false positives produced by the NARK 20023 exceeds both the DOC's own .05% maximum error rate and its 10% threshold for contract termination. Also, on information and belief, the bid response the DOC received for the NARK 20023 did not include any of the information regarding accuracy and clinical results for the NARK 20023 that the DOC demanded in its request for bids.

30.     Nevertheless, the DOC continues to purchase, use, and rely on the NARK 20023 to impose immediate punishment on incarcerated people.

### 2.     The DOC's Reliance on the NARK 20023 Violates the Due Process Rights of Incarcerated People

31.     Massachusetts recognizes "the importance of the use of mail by inmates to maintain appropriate contact with the community" and has established regulations allowing for incarcerated people to send and receive mail. 103 CMR 481.01. These regulations recognize the critical need for people in prison to be able to confidentially communicate with their attorneys, and the regulations accordingly set out detailed procedures and heightened protections for legal mail. *See* 103 CMR 481.10; 103 CMR 481.11.

32.     Since at least 2018, however, the DOC, at the direction or under the supervision of Commissioner Mici, has been using the NARK 20023 on legal mail and relying on false positives to punish incarcerated people. The DOC's reliance on the faulty NARK 20023 tests to take *any* action against incarcerated people violates the due process clause of the Massachusetts Constitution.

33.     When the DOC receives legal mail directed to an incarcerated person, an Inner Perimeter Security Officer or other DOC employee ("Corrections Officer" or "CO") will bring the mail to that individual. Before the DOC permits the incarcerated person to receive the mail, it requires the person sign a form to confirm that they are accepting the mail. The mail recipient must make this decision without being allowed to see the contents of the mail or to otherwise confirm the mail's legitimacy. After the incarcerated person signs to accept the mail, the CO has the discretion to take the mail out of view for testing using the NARK 20023.

34.     At the direction or under the supervision of Commissioner Mici, the DOC uses Sirchie's products to test legal mail for drugs—including by using the NARK 20023 purportedly to screen for synthetic cannabinoids. In order to test the mail using the NARK 20023, the CO often cuts out pieces of the legal mail itself. If the NARK 20023 test returns a "positive" result— as it often does, in light of the faulty nature of those tests—the DOC takes immediate punitive measures against the person to whom the mail was addressed, even before issuing a formal disciplinary ticket.

35.     In addition, at the direction or under the supervision of Commissioner Mici, the DOC attempts to dissuade incarcerated people from seeking to have their mail evaluated by laboratory testing by threatening that they will be required to pay for that testing. The DOC actively punishes incarcerated people both before they are given the opportunity to request laboratory testing and while waiting for the results of the laboratory tests—which often takes weeks or months. The DOC uses this time and threat of expense to try to coerce people into admitting the charges the DOC brought against them based on NARK 20023 test results.

36.     In essentially all circumstances, and regardless of whether the incarcerated person persists in demanding a laboratory test, the DOC issues the incarcerated person a disciplinary ticket. Such issuance violates 103 DOC 525.08(C)(2), which authorizes tickets only where the DOC "has reason to believe a disciplinary offense has been committed by an inmate." 103 DOC 525.08(C)(2).

37.     A positive NARK 20023 test on incoming legal mail *cannot* be a valid "reason to believe" that the addressee has committed any offense. Even assuming that incoming mail contained drugs, the mere fact that mail is addressed to a person cannot support the conclusion that the person to whom the mail was addressed did anything wrong. This is especially true here, because the DOC requires incarcerated people to confirm that they are willing to accept the mail at issue before allowing the person to see the contents of the mail or to confirm its legitimacy. Penalizing people for events entirely outside of their control violates every articulation of the right to due process under the Massachusetts Constitution.

9

38.     The DOC's punishment of incarcerated people based on a NARK 20023 test separately violates the person's due process rights because those tests return an extremely high level of false positives—and a "positive" test is therefore not evidence of *anything*.

39.     In addition to the issuance of a disciplinary ticket, the DOC imposes a number of other punishments on incarcerated people on the basis of faulty NARK 20023 tests, before laboratory testing is conducted. Those punitive measures include curtailments on the person's eligibility for parole or transfer, limitations on their ability to contact attorneys and family members, and termination of their ability to hold a job or participate in educational or other programming.

40.     At the direction or under the supervision of Commissioner Mici, the DOC frequently punishes people who are accused of receiving drugs in their legal mail by placing them immediately into solitary confinement in reliance on the NARK 20023 test. The DOC frequently does not provide the person with a disciplinary ticket explaining what they are accused of doing until days *after* it places them in solitary confinement or other restrictive housing conditions.

41.     This practice violates the DOC's own Regulations, which permit placement into Restrictive Housing only upon a finding by the Superintendent that "(a) the inmate poses an unacceptable risk to the safety of others, of damage or destruction [of] property, or to the operation of a correctional facility; (b) the inmate requires protection from harm by others; and/or (c) the inmate is serving a disciplinary detention sanction." 103 CMR 423.06.

42.     None of those situations exists for people whose only "offense" was to be the addressee on mail tested positive by NARK 20023 tests. A positive NARK 20023 test result presents no evidence whatsoever that a person presents *any* "risk to the safety of others, of damage or destruction [of] property, or to the operation of a correctional facility." In the same vein, a positive NARK 20023 test does not demonstrate that the person requires protection from harm by others. Finally, the DOC cannot rely on a separate "disciplinary detention sanction" to impose the punishment of Restrictive Housing here, because incarcerated people are routinely

confined to such conditions before they have even received a disciplinary ticket, much less a formal disciplinary hearing. Despite failing to satisfy any of the grounds for Restrictive Housing set out by regulation, the DOC nevertheless relies on the NARK 20023 to impose serious punishment on people whose mail tests positive.

43.     On information and belief, the DOC also fails to perform a meaningful tri-weekly "Placement Review" for people held in Restrictive Housing on the basis of NARK 20023 tests, as required by regulation. Indeed, the DOC is permitted to keep a person in Restrictive Housing following each Placement Review "only if the Superintendent or designee determines that the inmate poses an unacceptable risk: (a) to the safety of others, (b) of damage or destruction or property, or (c) to the operation of a correctional facility." 103 CMR 423.09(1)(b). No such determination is possible based on faulty NARK 20023 tests.

### C.     Defendants' Conduct Is Causing Immediate and Irreparable Harm

44.     Defendants' conduct is causing immediate and irreparable injury to Plaintiffs and the Class.

45.     The deprivation of the right to counsel is an intangible injury. Chilling that right is irreparable harm. Word of the false testing has spread through the prison system.

46.     After their prior experiences, Mr. Green and the Class are scared to accept legal mail. Plaintiffs want to and would otherwise receive mail from their counsel.

47.     Without the benefit of written correspondence, incarcerated people are being deprived of the opportunity to review copies of the materials filed in their cases or to otherwise participate in their own defense. As a result, they can miss deadlines and are deprived of the opportunity to point their counsel to relevant factual evidence or errors in pleadings and other court paperwork. They may default on their appeals, lose issues for collateral review, and be subjected to unconstitutional conditions of confinement.

48.     The DOC is separately depriving them of any meaningful right to counsel by making it difficult or impossible for attorneys to fulfil their role as counselors. Attorneys

throughout the Commonwealth are scared to send their clients mail and frequently are forced to spend time and incur additional expenses to communicate outside of the legal mail system—options which have been unavailable or even more burdensome during the pandemic. Attorneys are inhibited in their ability to perform their constitutionally protected—and in many instances Court-appointed—role as zealous advocates for their clients.

49.     In addition, at the direction or under the supervision of Commissioner Mici, the DOC grossly invades the protections afforded to privileged attorney-client communications by taking legal mail out of the sight of the recipient, testing it using a product that requires the physical alteration of the documents themselves, making copies of the legal mail, and keeping original legal documents "in evidence." Even the perception that the DOC may have an opportunity to read the contents of legal mail during these clandestine operations chills the willingness of both attorneys and clients to communicate honestly and comprehensively.

50.     The DOC's use of faulty NARK 20023 tests also imposes tangible harm. Lawyers and legal professionals experience severe distress as a result of false accusations that jeopardize their work and their reputation. Because the DOC has provided no guidance to attorneys about how they can ensure that their mail does not run afoul of faulty NARK 20023 tests, they incur significant additional expenses to communicate with their clients, including changing the manner in which they print and mail documents, having to travel many miles to deliver materials to clients in person, and losing earnings from time spent making these and other accommodations. And falsely accused incarcerated people suffer intensive confinement and deprivation of the few "privileges" they are afforded by the DOC, such as the ability to work, to pursue an education, and to communicate, including contact visits with family members and loved ones.

   **D.     Plaintiffs and the Class Have Suffered Substantial Injuries as a Result of Defendants' Wrongful Conduct**

        **1.     The DOC used the NARK 20023 to falsely accuse Plaintiff Green of importing drugs into prison via legal mail sent by the Boston College Innocence Program, resulting in two months of severe punishment and the destruction of confidential attorney-client communications**

51.     In early November 2019, Mr. Green received legal mail from the Boston College Innocence Program while he was incarcerated at MCI-Norfolk. An officer summoned Mr. Green, showed him that he had received mail from the clinic, and had Mr. Green sign to accept it. The officer then opened the mail in front of Mr. Green and examined it. The officer told Mr. Green he was taking the mail away for testing.

52.     Later that day, Mr. Green was called to the Internal Perimeter Security office, where several officers were waiting. The officers told Mr. Green that his legal mail had tested positive for "K2."

53.     Mr. Green was immediately sent to the Restrictive Housing Unit ("RHU"), where he was confined to a cell for twenty-three hours per day.

54.     Approximately two days after being sent to the RHU, Mr. Green was issued a disciplinary ticket. At that time, Mr. Green was offered the opportunity to request that his mail be sent out to a laboratory for additional testing, but to do so he had to agree to pay a fee of $100 for the testing if the results were positive for synthetic cannabinoids, or $50 even if the test was negative.  He was also threatened with an additional $432 charge for three years of mandatory, bi-monthly drug testing. Mr. Green was given a photocopy of his legal mail, a copy made by DOC officials outside the presence of both Mr. Green and his attorney.

55.     The DOC ultimately forced Mr. Green to spend three weeks in the RHU. During that time, Mr. Green missed his college classes and an event for troubled teens that he had been planning with the Young Men's Committee for eight months. His ability to communicate with people or receive visits was severely limited.

56.     Two months after the initial NARK 20023 test, laboratory testing confirmed that there were no drugs on Mr. Green's legal mail.

57.     When Mr. Green finally received the original copy of his legal mail, it was unreadable because the DOC had cut out so much of the paper to conduct the NARK 20023 test. Mr. Green described the mail as looking like a "paper snowflake."

58.     As a result of this experience, Mr. Green remains extremely nervous about and reluctant to receive legal mail.

>           **2.      The DOC used the NARK 20023 to falsely accuse attorney Lisa
>                    Newman-Polk of sending drugs to her client, Plaintiff Ivey, resulting
>                    in his immediate punishment and jeopardizing a favorable parole
>                    decision**

59.     On March 26, 2020, Mr. Ivey obtained a grant of parole from the Massachusetts Parole Board, a hard-earned accomplishment that took twenty-five years to achieve.

60.     On August 31, 2020, Mr. Ivey was approached by DOC staff in the room where legal mail is distributed. The officer showed Mr. Ivey a package from his lawyer, Lisa Newman-Polk, which included her name and address, and Mr. Ivey verified that Ms. Newman-Polk was his attorney. The officer then opened Mr. Ivey's legal mail and reviewed its contents. He removed one document, calling it "suspicious," and gave the rest of the legal mail to Mr. Ivey.

61.     Shortly after Mr. Ivey returned to his cell, additional COs called him back to the mail room. They detained Mr. Ivey and other COs entered his cell and seized all the legal materials sent to him that day by Ms. Newman-Polk. They later told Mr. Ivey that the materials had tested positive for synthetic cannabinoids.

62.     Documents subsequently obtained by Mr. Ivey and his counsel revealed that the COs used the NARK 20023 on Mr. Ivey's correspondence with his lawyer.

63.     Mr. Ivey was moved to the RHU, where he was confined to his cell for twenty-three hours per day. DOC staff accused him of trafficking drugs and demanded that he name his co-conspirators. Mr. Ivey denied the accusations, repeatedly explaining the mail had come from his lawyer and could not have contained drugs, and requesting laboratory testing on the mail.

64.     Upon learning about these accusations, Ms. Newman-Polk and her co-counsel contacted multiple DOC staff, including Commissioner Mici, and confirmed the legitimacy of the legal mail. They offered to provide a sworn affidavit attesting they had sent the legal mail and it contained no drugs. They emphasized that Mr. Ivey had no incentive to jeopardize his hard-won parole and urged the DOC to dismiss the charges and release him.

65.     The DOC nevertheless issued a Disciplinary Report against Mr. Ivey, charging him with eight separate offenses arising from his receipt of legal mail, including two in the most serious offense category available. Shortly thereafter, the DOC moved Mr. Ivey from the RHU to the Special Adjustment Unit ("SAU"), a different punitive housing unit focused on substance use disorder and behavior-related programming, which he did not need. In the SAU, Mr. Ivey was permitted only three to four hours out of his cell every day, was unable to attend his college courses, and was forced to take a lower-paying job.

66.     Unbeknownst to Mr. Ivey or Ms. Newman-Polk, the University of Massachusetts Medical School Drugs of Abuse Laboratory had analyzed Ms. Newman-Polk's legal mail on September 18, 2020, and determined that it did not contain any drugs. Nonetheless, on September 28th, the DOC informed Ms. Newman-Polk that Mr. Ivey was being punished for "receiving mail that *purported* to be legal mail and which is suspected to be K2/Synthetic Cannabinoids" and maintained its punitive measures against Mr. Ivey.

67.     It was not until October 14, 2020, that the DOC dismissed the Disciplinary Report against Mr. Ivey on the basis of the lab results.

68.     Ms. Newman-Polk described her experience in a letter to Commissioner Mici on October 26, 2020: "To say that this experience has been highly upsetting is an understatement. It has had a negative impact on my health and my family, as any accusation against Mr. Ivey was effectively an accusation that I committed a serious criminal offense. Although I did nothing wrong, I felt responsible for Mr. Ivey's circumstances since I was the one who sent the mail."

69.     Due to the punishment imposed on Mr. Ivey by the DOC, Mr. Ivey missed nearly a full semester of college courses, delaying his graduation from the program. Mr. Ivey was traumatized by his confinement in the Restrictive Housing Unit and the Secure Adjustment Unit. The most significant impact on Mr. Ivey's life, however, was the threat to his parole. Mr. Ivey had worked very hard to educate himself and prove he was someone who deserved a chance at parole. He would not have done anything to jeopardize that, and a serious disciplinary offense like the one he was wrongly accused of could have resulted in the parole decision being revoked.

15

## CLASS ALLEGATIONS

70.     This is a class action under Rule 23 of the Massachusetts Rules of Civil Procedure.

71.     Plaintiffs seek to represent the Class defined below, pending any modifications necessitated by discovery.

> All people currently or formerly incarcerated in a Massachusetts DOC facility who were or may be subjected to a NARK 20023 test.

72.     Excluded from the Class are: Sirchie, Premier Biotech, and any entities in which those companies have a controlling interest; any entities in which Sirchie or Premier Biotech's officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of Sirchie or Premier Biotech; any federal, state, or local governmental entities; the Judge and/or jury to whom this case is assigned and any member of the Judge's or jury's immediate family and any other judicial officer or juror assigned to this case; and any attorneys representing Plaintiffs or the Class in this action.

**A.      The Class meets the requirements for certification**

73.     The Class meets the requirements for certification under Rule 23 of the Massachusetts Rules of Civil Procedure.

74.     <u>Numerosity</u>. The members of the Class are so numerous that joinder of all members is impracticable. The exact number or identification of members in the Class is presently unknown. On information and belief, the Class includes hundreds of individuals. One indication of the numerosity of the Class are the thousands of Sirchie tests Premier Biotech has sold to the Massachusetts DOC, including more than 1,600 NARK 20023 tests since 2018.

75.     The identity of the Class members is ascertainable and can be determined based on available records maintained by the DOC. On information and belief, the DOC maintains records of its use of NARK 20023 tests and the punishments it imposes in reliance on those tests.

76.     <u>Predominance of Common Questions of Law and Issues of Fact</u>. There are
multiple questions of law and fact common to the Class that will predominate over questions
affecting only individual Class members, including, but not limited to:

    a)   Whether the DOC interfered with the Class's constitutionally
        protected right to counsel by using NARK 20023 tests on legal
        mail;

    b)   Whether the DOC violated the Class's due process rights by
        punishing them for the simple act of receiving legal mail;

    c)   Whether NARK 20023 tests produce false positives and/or
        negatives at rates which render them inappropriate as a basis for
        punishment or other action by the DOC against the addressee;

    d)   What damages and injunctive relief should be awarded to redress
        the harms suffered by the Class.

77.     Defendants' actions are common to all members of the Class.

78.     <u>Typicality</u>. Defendants' conduct caused Plaintiffs to suffer injuries similar to the
other members of theClass.

79.     <u>Adequacy</u>. Plaintiffs are adequate representatives of the Class because they have a
strong personal investment in the outcome of this litigation and their interests do not conflict
with the interests of the members of the Class. Plaintiffs are represented by experienced and
competent Class Counsel. Class Counsel intends to prosecute this action vigorously for the
benefit of the entire Class. Plaintiffs and Class Counsel can fairly and adequately protect the
interests of all of the Members of the Class.

80.     <u>Superiority</u>. The class action is superior to other available methods for fairly and
efficiently adjudicating this controversy because individual litigation of Class members' claims
would be impracticable and individual litigation would be unduly burdensome to the courts.
Further, individual litigation has the potential to result in inconsistent or contradictory
judgments. There is no foreseeable difficulty in managing this action as a class action and it
provides the benefits of single adjudication, economies of scale, and comprehensive supervision
by a single court.

## **COUNT I**

<u>Violation of the Massachusetts Civil Rights Act (Mass. Gen. Laws ch. 12, § 11) Deprivation of Right to Counsel</u>

81.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

82.     The Massachusetts Constitution guarantees incarcerated persons the right to due process. In many respects, the Constitution of the Commonwealth of Massachusetts provides broader protections than the United States Constitution.

83.     Under the supervision or at the direction of Commission Carol Mici, the DOC has interfered and/or attempted to interfere with the enjoyment by Plaintiffs and the Class of their constitutional rights to counsel and access to the courts by way of threats, intimidation, or coercion.

84.     As described herein, the DOC under Commissioner Mici's direction or supervision is significantly impeding the ability of incarcerated people to confer confidentially with their attorneys. By arbitrarily testing incoming legal mail with the faulty NARK 20023 tests, by imposing draconian (and illegal) sanctions upon incarcerated people immediately upon any presumptive positive test, and by baselessly accusing attorneys of sending drugs into DOC facilities, the DOC has threatened both incarcerated people and their advocates who attempt to exercise their constitutional rights to counsel, to participate in their own defenses, and to access the courts.

85.     As a direct result of the DOC's unlawful conduct, directed or condoned by Commissioner Mici, Plaintiffs and members of the Class have suffered and continue to suffer deprivations of their constitutional right to counsel.

## **COUNT II**

<u>Violation of the Massachusetts Civil Rights Act (Mass. Gen. Laws ch. 12, § 11) Deprivation of Right to Due Process</u>

18

86.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

87.     Under the Massachusetts Constitution, incarcerated people may not be deprived of life, liberty, or property without due process of law.

88.     Under the supervision or at the direction of Commission Carol Mici, the DOC has interfered and/or attempted to interfere with the enjoyment by Plaintiffs and members of the Class of their constitutional rights to due process by way of threats, intimidation, or coercion.

89.     Among other things, the DOC under Commissioner Mici's direction or supervision has interfered with the due process rights of Plaintiffs and members of the Class by imposing punishment and depriving them of the various liberty interests described herein— including by placing them in solitary confinement and/or in other restrictive housing—in knowing reliance on inadequate and inaccurate drug tests.

90.     The DOC under Commissioner Mici's direction or supervision has further violated Plaintiffs Green and members of the Class's due process rights by punishing them in reliance on mail *addressed* to them, without giving them an opportunity to review the contents of that mail to confirm its legitimacy and without the DOC providing any evidence whatsoever of how the incarcerated person actually was involved—aside from the associational relationship of being represented by counsel (which includes Court-appointed counsel)—in any wrongdoing related to the sending of that legal mail. Penalizing people for events entirely outside of their control violates every articulation of the right to due process under the Massachusetts Constitution.

91.     The DOC under Commissioner Mici's direction or supervision accomplished such interference by threatening, intimidating, and coercing class members, including by forcing class members to forego their rights to due process in order to escape ongoing deprivations of liberty during the long pendency of confirmatory testing necessary to correct the faulty NARK 20023 testing.

19

92.     As a direct result of the DOC's unlawful conduct, directed or condoned by Commissioner Mici, Plaintiffs and members of the Class have suffered and continue to suffer deprivations of their constitutional right to due process.

## COUNT III

### Claim for Declaratory Judgment, Mass. Gen. Laws ch. 231A, §1

93.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

94.     A real and active controversy exists between the parties as to whether, by relying on the results of the NARK 20023 test as the basis for any punishment or other action taken against members of the Class, the DOC and Commissioner Mici have violated the civil rights guaranteed by the Massachusetts Constitution, including the right to due process and the right to counsel.

95.     Plaintiffs and the Class are entitled to a judgment declaring that:

a) The DOC's use of NARK 20023 tests on legal mail violates the constitutionally protected rights of the Class;

b) The DOC's imposition of punishment based on the results of NARK 20023 tests violates the due process rights of the Class; and

c) The DOC's imposition of punishment based on the results of NARK 20023 tests interferes with and/or deprives the Class of their constitutionally protected rights to counsel and to participate in their own defense.

## Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court:

A.     Certify this action as a Class Action under Rule 23 and appoint Mr. Ivey and Mr. Green as representatives of the Class and their attorneys as Class Counsel;

B.     Enter judgment in favor of Plaintiffs and the Class and against Defendants on each of the Counts stated above;

C.     Declare that the DOC's use of NARK 20023 tests on legal mail at the direction of Commissioner Mici violates the constitutionally protected rights of the Class;

D.      Declare that the DOC's imposition of punishment based on the results of NARK 20023 tests at the direction of Commissioner Mici violates the due process rights of the Class;

E.      Declare that the DOC's imposition of punishment based on the results of NARK 20023 tests at the direction of Commissioner Mici interferes with and/or deprives the Class of their constitutionally protected rights to counsel and to participate in their own defense;

F.      Direct the DOC and Commissioner Mici to adjourn and/or expunge all records of DOC's use of NARK 20023 tests on legal mail, including any test results and/or disciplinary sanctions the DOC imposed as a result of the DOC's use of NARK 20023 tests on legal mail;

G.      Order disgorgement of all wrongfully collected fees, fines, and other payments premised on NARK 20023 tests.

H.      Temporarily enjoin the DOC from using NARK 20023 tests on legal mail, until a system to verify legal mail with appropriate safeguards for the constitutionally protected rights to counsel, equal protection under the law, and the right to be free from cruel and unusual punishment can be developed;

I.      Permanently enjoin the DOC from using NARK 20023 tests to evaluate the presence of drugs on paper correspondence or material;

J.      Award Plantiffs and the Class costs and reasonable attorneys' fees, pursuant Mass. Gen. Laws ch. 12 and § 11I, Mass. Gen. Laws ch. 231A, § 7.

K.      Grant such other further relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all claims so triable.


Dated: October 4, 2021                         Respectfully submitted,

                                        */s/ Max D. Stern*
                                        Max D. Stern (BBO No. 479560)
                                        Lorraine Belostock (BBO No. 692183)
                                        **Todd & Weld LLP**
                                        One Federal Street, 27th Floor
                                        Boston, MA 02110
                                        Tel: (617) 720-2626
                                        mdstern@toddweld.com
                                        lbelostock@toddweld.com

                                        Janet Herold (BBO No. 632479)
                                        Benjamin Elga (BBO No. 697933)
                                        **Justice Catalyst Law, Inc**.
                                        123 William St., 16th Floor
                                        New York, NY 10038
                                        Tel: (518) 732-6703
                                        jherold@justicecatalyst.org
                                        belga@justicecatalyst.org

                                        Ellen Leonida*
                                        Matthew Borden*
                                        Christman Rice*
                                        Eric Schlabs*
                                        **BraunHagey & Borden LLP**
                                        351 California Street, 10th Floor
                                        San Francisco, CA 94104
                                        Tel. & Fax: (415) 599-0210
                                        leonida@braunhagey.com
                                        borden@braunhagey.com
                                        rice@braunhagey.com
                                        schlabs@braunhagey.com

                                        *Attorneys for Plaintiffs Julian Green, Eugene Ivey,
                                        and the Class*

                                        * *Pro hac vice* applications forthcoming