# EXHIBIT A

# NOTIFY

## Green v. Massachusetts Department of Correction, et al.[1]

Suffolk Superior Court Action No. 2184CV02283-C

**Memorandum of Decision and Order Regarding Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Docket Entry No. 3), and Defendants' Motion to Stay (Docket Entry No. 12).**

### Procedural Background

This is a putative class action filed by two individuals who are, or previously were, incarcerated in correctional facilities operated by defendant Massachusetts Department of Correction ("DOC" or, collectively with Commissioner Carol Mici, "Defendants"). Plaintiff Julian Green ("Mr. Green") currently is incarcerated at DOC's MCI-Norfolk facility. Plaintiff Eugene Ivey ("Mr. Ivey" or, collectively with Mr. Green, "Plaintiffs") previously was incarcerated at DOC's Northeastern Correctional Center, but was released on parole in August 2021. Plaintiffs allege that they and other incarcerated persons have been deprived of their due process rights and right to counsel by DOC's use of the NARK 20023 chemical test (the "NARK II Test" or just the "Test") -- which Plaintiffs describe as a "highly inaccurate" and "unreliable" field drug test -- to purportedly detect the presence of illegal "synthetic cannabinoids" on incoming mail from incarcerated individuals' legal counsel (hereinafter "legal mail" or "privileged mail").  According to Plaintiffs, DOC uses a positive result from a NARK II Test as the *sole* basis for imposing punishment upon incarcerated individuals and for actually (or effectively) denying them access to their privileged mail. Plaintiffs have asserted claims under the Massachusetts Civil Rights Act, G.L. c. 12, § 11I (the "MCRA"), and for declaratory relief.

DOC, for its part, generally admits using the NARK II Test as alleged by Plaintiffs, and further admits that it does not really know how reliable the Test is or how frequently it generates inaccurate results.[2] Nevertheless, Defendants deny any wrongdoing or unlawful infringement of Plaintiffs' rights.

Plaintiffs filed their Complaint in this case on October 5, 2021. See Docket Entry No. 1. Plaintiffs' Complaint was accompanied by a Motion for Temporary Restraining Order and Preliminary Injunction (the "P.I. Motion"). See Docket Entry No. 3. By means of the

---

[1] The other defendant identified in Plaintiffs' Class Complaint is Carol Mici, the Commissioner of the Massachusetts Department of Correction, in her official capacity. See Class Complaint (the "Complaint," Docket Entry No. 1).

[2] Counsel for DOC initially suggested at the hearing on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction that DOC has stopped using the NARK II Test as the sole basis for imposing punishment upon incarcerated persons housed in its facilities, and for denying them access to their privileged mail. Upon further questioning by the Court, that suggestion proved to be chimeric.

P.I. Motion, Plaintiffs seek a court order preliminarily enjoining DOC from "imposing any punitive, disciplinary, or other measures against incarcerated people" based on "positive" NARK II Test results obtained from their privileged mail. Defendants have submitted a written opposition to Plaintiffs' P.I. Motion, along with an affidavit and various other materials. Defendants also have filed a Motion to Stay this action while a parallel federal court action that Plaintiffs recently commenced against Sirchie Acquisition Co. LLC ("Sirchie"), the manufacturer and distributor of the NARK II Test, to which Defendants are not parties, is litigated.[3] See Docket Entry No. 12. Plaintiffs oppose Defendants' Motion to Stay. All parties have thoroughly briefed the question of whether a preliminary injunction and/or a stay should issue.

The Court conducted a hearing on Plaintiffs' Motion on October 20, 2021. Upon consideration of the written submissions and the oral arguments of the parties, the Court will **ALLOW** Plaintiffs' P.I. Motion and **DENY** Defendants' Motion to Stay for the reasons summarized, briefly, below.

## The Facts

The following facts, most of which are undisputed, are taken from the allegations contained in Plaintiffs' Complaint, the affidavits and other written materials submitted by the parties, and the admissions made by counsel during oral argument. See Doe v. Superintendent of Schools of Weston, 461 Mass. 159, 160 (2011) (recounting facts taken from plaintiff's complaint and attached exhibits in reviewing trial court's decision on preliminary injunction motion).

The transportation of illegal drugs into prisons and other correctional institutions operated by DOC presents a "major security concern." See Defendants' Opposition to Plaintiffs' Motion for Restraining Order and Preliminary Injunction and In Support of Defendants' Motion to Stay ("Defendants' Opp.," Docket Entry No. 13) at 4. According to DOC, it "has seen a dramatic increase in attempts to introduce illicit substances" into DOC facilities "through fraudulent legal mail." Affidavit of Timothy Gotovich ("Gotovich Aff."), ¶ 6. Some of the "illicit substances" of particular concern to DOC are "synthetic cannabinoids," which are a type of "unregulated, mind-altering substance that can be found in many forms," including as a liquid that can be "sprayed onto … [a] mail article (e.g. paper documents) in the effort to absorb the illicit substance into the paper to be smoked." Id., Exhibit B

---

[3] Defendants initially were parties to the parallel federal court action, captioned Green v. Sirchie Acquisition Co. LLC, Case No. 1:21-cv-11504-GAO (the "Related Federal Action"), but were voluntarily dismissed from that case by Plaintiffs on October 4, 2021, after Sirchie removed the case to federal court from Massachusetts Superior Court, where it originally was filed. Plaintiffs commenced this separate Superior Court case solely against Defendants the following day.

-2-

(DOC internal bulletin titled "Illicit Substance Introductions (Legal and Non-Legal Mail)," disseminated December 8, 2020) at 1.[4]

Since at least 2018, DOC has used colorimetric NARK II Tests manufactured by Sirchie to purportedly detect synthetic cannabinoids on mail sent by attorneys and other legal professionals to their incarcerated clients at DOC facilities around the Commonwealth.[5] The NARK II Test, however, is "merely presumptive." See Plaintiffs' Consolidated Reply ("Plaintiffs' Reply," Docket Entry No. 22), Exhibit A (Memorandum in Support of Sirchie's Motion to Dismiss in Related Federal Action) at 4. As plainly stated by Sirchie on the NARK II Test product packaging,

> NARK only tests for the *possible* presence of certain chemical compounds. Reactions may occur with, and such compounds can be found in, both legal and illegal products.

*Id.* (emphasis added). Accordingly, Sirchie expressly warns that "ALL [NARK II] TEST RESULTS MUST BE CONFIRMED BY AN APPROVED ANALYTICAL LABORATORY!" *Id.* (emphasis in original).

DOC uses the NARK II Test to test incoming legal mail in a manner different than that recommended by Sirchie, the test manufacturer. When the DOC receives legal mail addressed to an incarcerated person, an Inner Perimeter Security Officer or other DOC employee ("CO") brings the mail to the person to whom it is addressed. Declaration of Ellen Leonida ("Leonida Decl."), ¶ 5(d); Declaration of Eugene Ivey ("Ivey Decl."), ¶ 7. Before the CO permits the incarcerated person to receive the mail item, he or she requires the incarcerated person to confirm, in writing, that the incarcerated person is willing to accept the item. *Id.* Assuming the incarcerated person agrees to accept the mail item, the CO opens the item in the incarcerated person's presence. *Id.* If the CO finds the mail item to be "suspicious" for any reason, the CO will take away the item for field testing using the NARK II Test. *Id.* If the NARK Test returns a "positive" result, DOC confiscates the mail item and imposes immediate punitive measures on the incarcerated person to whom the mail was addressed, notwithstanding the lack of a confirmatory lab test. Leonida Decl., ¶¶ 5(e)-(h); Ivey Decl., ¶¶ 9-11; Declaration of Rebecca A. Jacobstein ("Jacobstein Decl."), ¶¶ 10-12. The immediate punitive measures imposed by DOC include, among other things, placement of the incarcerated person in solitary confinement or a restrictive housing unit ("RHU"), curtailment of the person's eligibility for parole or transfer, limitations on the person's ability to communicate with his or her attorneys and

---

[4] The Gotovich Affidavit can be found appended to Defendants' Opp. as Exhibit 6.

[5] A colorimetric test uses "reagents ... that are intended to react with a specific molecular group found in the target drug, producing a specific color or pattern of colors from which a presumptive positive identification may be inferred." Declaration of Professor Heather L. Harris ("Harris Decl."), ¶ 11.

family members, and termination of the person's ability to hold a job or participate in educational and other programming. Leonida Decl., ¶¶ 5(f)-(h); Ivey Decl., ¶¶ 10-12; Jacobstein Decl., ¶¶ 10-12. DOC keeps the punitive measures in place until a confirmatory test can be conducted by an analytical laboratory, which often takes months. Leonida Decl., ¶¶ 5(g)-(i); Jacobstein Decl., ¶¶ 11-12.

Plaintiffs have alleged, with substantial evidentiary support, that the NARK II Test, even when used properly, returns an extremely high rate of false positive test results. According to data produced by DOC in response to a Public Records Act request, at least 122 items tested by DOC personnel between July 2019 and March 2021, which had tested positive for synthetic cannabinoids using the NARK II Test, proved not to contain any illicit substances when eventually subjected to a confirmatory lab test. Declaration of Eric Schlabs ("Schlabs Decl."), Exhibit E. Converting this data into a precise *rate* of false positive test results is difficult to do because DOC did not include information concerning the total confirmatory test population for the corresponding time period in its response, and DOC itself admits that it does not, in fact, know the actual rate of false positive results generated by the NARK II Test. Other, more limited data provided by DOC, however, indicates that confirmatory laboratory testing of suspected legal mail conducted in the August 2019 to August 2020 time period reveals that DOC's positive drug field tests during that period (presumably obtained using the NARK II Test) were accurate only sixty-two percent (62%) of the time.[6] Gotovich Aff., Exhibit B at 7. Or, put another way, the limited data provided by DOC for the August 2019 to August 2020 time period reveals that DOC's field tests during that period had a false positive rate of approximately thirty-eight percent (38%). *Id.* For perspective, that false positive rate is more than *three times* the maximum false positive rate DOC itself said would be acceptable when it issued its official "Request for Response," by which it first began purchasing the NARK II Test in 2017. Schlabs Decl., Exhibit A (DOC Request for Response for "Drug Testing Materials, Services and Supplies," issued May 5, 2017, at 8 ("False positives exceeding 10% will result in contract termination.").

The high false positive rate associated with the NARK II Test is attributable to a number of factors, including the fact that some of the hundreds of different types of synthetic cannabinoids are structurally similar to chemical compounds that can be found in many common, innocuous products, such as commercial inks and other chemicals found in and on paper. Harris Decl., ¶ 12. The large number of different types of synthetic cannabinoids also means that the NARK II Test, which purports to detect only eight synthetic cannabinoid formulas, is incapable of detecting the most common types of synthetic cannabinoids in circulation over the last five years. *Id.*, ¶¶ 19-23. Indeed,

---

[6] The Gotovich Affidavit states that "DOC currently uses the NARK [II] test as a field test." Gotovich Affidavit, ¶ 8.

Plaintiffs have submitted evidence, which has not been rebutted or even addressed by DOC, that the NARK II Test detects *none* of the fifteen most common synthetic cannabinoid formulations in circulation as of 2019-2020. Schlabs Decl., Exhibit G (National Forensic Laboratory Information System reports identifying most common synthetic cannabinoids from 2016 to 2020).

Sirchie, in the Related Federal Action, has been critical of the manner in which DOC currently uses the results of its NARK II Test to make disciplinary decisions involving incarcerated persons. In moving to dismiss Plaintiffs' claims in that proceeding, Sirchie stated,

> [i]t is undisputed that the DOC received [Sirchie's] documentation and warnings of the presumptive nature of the NARK II Test Kit. On this basis alone, it is clear that the superseding cause of Plaintiffs' alleged harm was the alleged failure of the DOC to acknowledge the presumptive nature of the NARK II Test Kit and/or follow the written instructions directing laboratory confirmation of any results obtained from the NARK II Test Kit.

Plaintiffs' Reply at 13.

DOC's ongoing practice of using questionable field test results obtained from the NARK II Test to impose immediate punitive measures on incarcerated persons and to deny them access to their legal correspondence has an adverse impact not only on the particular individuals who are punished, but also on other incarcerated persons who know of DOC's practice and live in fear that they may be subject to unjustified punishment if they accept incoming legal mail that falsely tests positive for synthetic cannabinoids. As a result, many incarcerated people are either refusing to sign for their incoming mail, or are directing their legal counsel not to send any mail into DOC facilities. Leonida Decl., ¶ 6; Ivey Decl., ¶ 15; Jacobstein Decl., ¶ 10. Thus, the net effect of DOC's continuing use of the NARK II Test is to both subject a significant number of incarcerated persons to unwarranted punishment, and to broadly chill and inhibit the rights and ability of all incarcerated person within DOC facilities to meaningfully participate in their own legal defense.

Plaintiffs' Related Federal Action against Sirchie remains pending. Defendants acknowledge that the reliability (or unreliability) of Sirchie's NARK II Test is a "central allegation" in this action, but claim that "[a]ll of the documents and data relating to the reliability of the NARK [II] test ... are in the possession of Sirchie" and may not be accessible in this case. Defendants' Opp. at 22-23. Defendants also claim that allowing this action to go forward, while the Related Federal Action is pending, "is a waste of

judicial resources and has the potential to lead to conflicting results." Id. at 23. On these grounds, Defendants request that the Court stay this action, in its entirety, "until such time as [the Related Federal Action] is decided." Defendants' Motion to Stay at 1.

## Discussion

The Court first addresses whether a stay of this action is appropriate. The Court then turns to the question of whether Plaintiffs are entitled to the preliminary injunctive relief they seek.

I. Defendants' Motion to Stay.

"[A] motion to stay proceedings is ordinarily a matter addressed to the sound discretion of the trial judge." Travenol Laboratories, Inc. v. Zotal, Ltd., 394 Mass. 95, 97 (1985) ("Travenol"). Where two related lawsuits overlap only in part, the question of whether to stay one action in favor of the other must take into account all the relevant circumstances, including "the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute." TPM Holdings, Inc. v. Intra-Gold Industries, Inc., 91 F.3d 1, 4 (1st Cir. 1996). A stay is not justified, however, where "[t]here is no commonality of parties and interests between the two cases." State Farm Fire & Casualty Co. v. Brown, 2009 WL 10690016, at *2 (D. Conn. Nov. 4, 2009). See also Bandit Industries, Inc. v. Woodsman, Inc., 2007 WL 2773567, at *3 (E.D. Mich. Sept. 21, 2007) (declining to stay federal court action in favor of previously-filed state court actions "where the actions do not involve, nearly identical parties and issues").

No stay is warranted in this case. While some of the plaintiffs in this action and in the Related Federal Action are the same, the defendants are not. Moreover, the plaintiffs' single claim against Sirchie in the Related Federal Action sounds in negligence and raises issues that are, in many respects, decidedly different from the issues presented in this case. An examination of the plaintiffs' complaint in the Related Federal Action discloses that the extent of the substantive overlap between that action and this one is, in fact, quite small.[7] See Defendants' Opp., Exhibit 2 (Class Complaint in Related Federal Action). Accordingly, the Court declines to exercise its discretion to stay this case pending the resolution of the Related Federal Action. See Travenol, 394 Mass. at 97.

---

[7] For example, the plaintiffs' negligence claim against Sirchie in the Related Federal Action is based, in significant part, on Sirchie's purported failure to properly warn DOC and train DOC employees regarding the alleged "limitations and risks" of its NARK II Test. Defendants' Opp., Exhibit 2 at 25-26. Sirchie's alleged conduct in this respect has no bearing on any of the issues to be decided in this case.

-6-

II.  Plaintiffs' Motion for a Preliminary Injunction.

   a.  *The Preliminary Injunction Standard.*

In order to obtain preliminary injunctive relief, Plaintiffs must show that: "(1) success is likely on the merits; (2) irreparable harm will result from denial of the injunction; and (3) the risk of irreparable harm to the moving party outweighs any similar risk of harm to the opposing party." *Cote-Whitacre v. Department of Pub. Health*, 446 Mass. 350, 357 (2006) (Spina, J., concurring), citing *Packaging Indus. Group, Inc. v. Cheney*, 380 Mass. 609, 616-617 (1980). Where, as here, a preliminary injunction proceeding involves public entities, the court also must consider whether the "requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public." *Commonwealth v. Mass. CRINC*, 392 Mass. 79, 89 (1984) ("*Mass. CRINC*"). In all instances, the decision whether to grant a preliminary injunction is a matter within the discretion of the presiding judge. See *Commonwealth v. Fremont Investment & Loan*, 452 Mass. 733, 741 (2008) ("We review the grant or denial of a preliminary injunction to determine whether the [motion] judge abused his discretion, that is, whether the judge applied proper legal standards and whether there was reasonable support for his evaluation of factual questions.").

   b.  *Likelihood of Success.*

Plaintiffs have demonstrated a likelihood of success on their claims that DOC's use of the NARK II Test as the sole basis for imposing punishment and for actually, or effectively, denying incarcerated individuals access to their privileged mail violates Section 11I of the MCRA. To prevail under the MCRA, Plaintiffs must prove that: "(1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." *Currier v. National Bd. of Medical Examiners*, 462 Mass. 1, 12 (2012) ("*Currier*"). The Court is persuaded that Plaintiffs have satisfied all three of these elements.

First, Plaintiffs possess a fundamental constitutional right to the assistance of counsel. See, e.g., *Lavallee v. Justices in the Hampden Superior Court*, 442 Mass. 228, 234 (2004) ("*Lavellee*") ("There is no question that the right to counsel is a fundamental constitutional right...."). In addition, incarcerated persons possess a constitutional right of access to the courts, which requires prison authorities to assist inmates in the preparation and filing of legal papers by, among other things, providing prisoners with adequate assistance from persons trained in the law. *Bounds v. Smith*, 430 U.S. 817, 828 (1977), abrogated on other grounds by *Lewis v. Casey*, 518 U.S. 343, 354 (1996) (disclaiming statements in *Bounds* suggesting state must enable prisoner to discover grievances and to litigate

effectively once in court). See also *Procunier v. Martinez*, 416 U.S. 410, 419 (1974) (noting that prison "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid").

Plaintiffs also possess a fundamental right "'not [to] be deprived of life, liberty, or property without due process of law.'" *O'Malley v. Sheriff of Worcester County*, 415 Mass. 132, 135 (1993) ("*O'Malley*"), quoting *Wolff v. McDonnell*, 418 U.S. 539, 555-556 (1974). The fundamental right to due process means, *inter alia*, that "isolation may not be imposed [upon an incarcerated person] arbitrarily or at the unbridled discretion of prison officials." *Id.* at 137.

Second, it is apparent in this case that DOC is using field test results obtained from the NARK II Test, by themselves, to "interfere" with Plaintiffs' right to counsel and their right to be free from placement in isolation "arbitrarily or at the unbridled discretion of prison officials." *Id.* There is no dispute that DOC currently is using the NARK II Test in a manner that contravenes the express warnings and instructions provided by the test's manufacturer, Sirchie. See Plaintiffs' Reply, Exhibit A at 4. Sirchie's warnings and instructions reflect its explicit acknowledgement that results generated by the NARK II Test are not sufficiently reliable, in-and-of-themselves, to be used for any purpose without "CONFIRM[ATION] BY AN APPROVED ANALYTICAL LABORATORY!" *Id.* (emphasis in original).

Sirchie's pronouncements in this regard are well justified. The overwhelming evidence before this Court is that the NARK II Test, by itself, is a highly unreliable means of determining whether a particular mail item actually contains any illicit synthetic cannabinoids. The best information offered is that the NARK II Test returns false positive results approximately thirty-eight percent of the time, which is only marginally better than a coin-flip, and exponentially worse than the false positive rate that DOC itself has indicated is acceptable.[8] See Gotovich Aff., Exhibit B at 7; Schlabs Decl., Exhibit A at 8. Alternatively, if the Court accepts DOC's assertion that the reliability of the NARK II Test is, in fact, unknown, then DOC is effectively flying blind when it uses that test as the sole basis for imposing punitive measures on incarcerated persons and/or denying them

---

[8] DOC took the position at oral argument that the thirty-eight percent false positive rate listed in its December 2020 internal bulletin may be *overstated* because it does not reflect positive field test results that were not challenged by the relevant incarcerated person and, therefore, not subjected to confirmatory laboratory testing. The Court acknowledges that such a possibility exists, but also recognizes that the false positive rate may be *understated* because it does not reflect any inaccurate, positive field test results that were not challenged by the relevant incarcerated person solely out of that person's desire to avoid an extended period of isolation while awaiting the results of a confirmatory test. Speculation as to the true facts, however, does not qualify as admissible evidence. See, e.g., *Commonwealth v. Ruell*, 459 Mass. 126, 135 (2011) (acknowledging that "speculative and remote evidence" offered at trial was properly excluded as "not admissible").

access to their privileged mail. In either case, the Court's conclusion is the same: DOC's use of the unreliable NARK II Test as the sole basis for imposing punitive measures on incarcerated persons housed in its facilities and/or denying them access to their privileged mail constitutes an arbitrary and unlawful interference with Plaintiffs' right to counsel, as well as their right to due process.[9] See Lavallee, 442 Mass. at 234; O'Malley, 415 Mass. at 137. Cf. Querubin v. Commonwealth, 440 Mass. 108, 118 (2003) (recognizing that, in deciding whether to admit defendant to bail, evidence considered by court "must be sufficiently reliable to avoid any significant risk of an erroneous deprivation of liberty.").

Third, Plaintiffs have established that DOC's interference with Plaintiffs' right to counsel and right to due process is undertaken "by threats, intimidation, or coercion." Currier, 462 Mass. at 12. For purposes of the MCRA, a "threat" consists of "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"; "intimidation" involves "putting in fear for the purpose of compelling or deterring conduct"; and "coercion" is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Haufler v. Zotos, 446 Mass. 489, 505 (2006) ("Haufler") (internal quotation marks and citations omitted). Plaintiffs have submitted evidence, which DOC has not disputed, that, when an incarcerated person's legal mail tests positive for synthetic cannabinoids using the NARK II Test, that person is,

> given a choice....; they can either request a confirmatory test and wait in the RHU until the test results come back, which can take months, or they can admit to receiving contraband and return to general population after a short period of time (generally around ten days).

Jacobstein Decl., ¶ 11.

---

[9] In this context, the Court rejects the rather novel argument presented by DOC at the hearing on Plaintiffs' P.I. Motion that the Massachusetts Supreme Judicial Court's ("SJC") decision in LaChance v. Comm'r of Correction, 463 Mass. 767, 777 (2012) ("LaChance"), authorizes DOC to place incarcerated persons in isolation "arbitrarily," so long as the period of isolation lasts no longer than ninety days. LaChance includes no such holding. Rather, the SJC held in LaChance that, "in no circumstances may an inmate be held in segregated confinement on awaiting action status for longer than ninety days without a hearing." Id. at 777. The SJC fashioned the ninety-day limitation in an express effort to "balance the inmate's interest -- to challenge potentially arbitrary detention in severe conditions -- with that of prison officials -- to secure the reclassification or transfer of an inmate who poses a threat to himself, to fellow inmates, or to the security of the facility." Id. Nowhere in LaChance did the SJC state or rule that "arbitrary detention" is permissible in-and-of-itself, nor did it overrule its prior holding in O'Malley that "isolation may not be imposed [upon an incarcerated person] arbitrarily or at the unbridled discretion of prison officials." 415 Mass. at 137. To the contrary, the SJC's decision in LaChance explicitly recognizes an incarcerated person's right to "challenge potentially arbitrary detention in severe conditions...." Id. Thus, the Court is confident that the SJC never has authorized DOC to treat incarcerated persons "arbitrarily."

-9-

DOC's practice of placing an incarcerated person in a Restrictive Housing Unit (effectively isolation) based solely on the results of a NARK II Test on his or her incoming legal mail, unless the person admits that the mail item at issue contains illegal contraband, undeniably constitutes: (1) "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm" (*i.e.*, a "threat"); (2) "putting in fear for the purpose of compelling or deterring conduct" (*i.e.*, "intimidation"); and (3) "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done" (*i.e.*, "coercion"). See *Haufler*, 446 Mass. at 505. The arguable effect of this practice, whether or not intended by DOC, is to arbitrarily impose punitive sanctions on selected incarcerated persons based on patently unreliable test data without due process of law, and to chill and otherwise interfere with the right to counsel enjoyed by all incarcerated persons. Accordingly, all of the elements necessary to establish viable claims against DOC for violating the MCRA, as alleged in Plaintiffs' Complaint, have been satisfied in this case. See *Currier*, 462 Mass. at 12.

c.  *Irreparable Harm.*

Plaintiffs' risk of irreparable harm also is established. The implication of constitutional rights in Plaintiffs' MCRA claims is sufficient to satisfy the requirement of proof of irreparable harm.[10] See, e.g., *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2nd Cir. 1996) (irreparable harm requirement satisfied when constitutional rights are implied in the analysis); *Basank v. Decker*, 449 F. Supp. 3d 205, 213 (S.D.N.Y. 2020) ("Petitioners have also shown irreparable injury because ... they face a violation of their constitutional rights.").

d.  *Balance of the Harms.*

The balance of the harms decidedly favors Plaintiffs. Enjoining DOC from using NARK II test results as the sole basis for imposing punishment upon incarcerated persons and for denying them access to their privileged mail will serve to protect those persons from the continued loss of their constitutional rights to counsel and to due process. DOC, on the other hand, will suffer little, if any, harm should the Court issue such an injunction because

---

[10] To the extent DOC argues that loss of the ability to communicate with legal counsel by mail does not actually impair an incarcerated person's right to counsel because he or she still can "confer with [his or her] attorney through private telephone calls, Zoom video calls, in-person contact visits in a private room, and non-privileged email communication" (see Defendants' Opp. at 15-16), that argument was disproven by DOC's concession during oral argument that legal counsel are not permitted to share confidential documents with their incarcerated clients via email, and by the testimony of Plaintiffs' counsel that most "in-person" meetings with clients in the RHU are non-contact visits conducted "either through a mesh barrier, through which it is difficult to hear, or over a phone." Jacobstein Decl., ¶ 13. Neither of these alternatives permits counsel to share documents, in confidence, with their incarcerated clients.

DOC still will be able to use the NARK II test and impose punishment upon incarcerated persons based on any positive test results, *so long as DOC first verifies the NARK II test results through a confirmatory lab test.* DOC possesses ample opportunity to undertake confirmatory testing before taking action because neither the incarcerated person, nor the original suspect mail item can be expected to go anywhere in the interim. Thus, if an injunction enters, DOC will retain the ability to deter the transportation of illegal drugs into its correctional institutions and punish wrongdoers in appropriate cases. The only difference will be that DOC will be required to do so based on demonstrable facts, and not on arbitrary and unlawful guesswork.

    e.    *The Public Interest.*

Issuance of the requested injunction also "promotes the public interest." *Mass. CRINC*, 392 Mass. at 89. Protecting the constitutional rights of incarcerated persons is in the public interest. See, e.g., *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) ("[I]t is always in the public interest to protect constitutional rights."). See also *Prison Legal News v. County of Sacramento*, 2012 WL 1075852, at *1 (E.D. Cal. Mar. 8, 2012) (holding that it "promotes the public interest" to preliminarily enjoin county sheriff, on First Amendment grounds, from preventing incarcerated persons from receiving plaintiff's publication, "Prison Legal News"). Enjoining arbitrary conduct on the part of DOC personnel further promotes the public interest by avoiding the associated unfairness and loss of confidence in the Commonwealth's correctional system that otherwise may result. See *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 508-509 (1984) (recognizing that the "appearance of fairness ... [is] essential to public confidence in the criminal justice system").

## Order

For the foregoing reasons, Defendants' Motion to Stay (Docket Entry No. 12) is **DENIED**, and Plaintiffs' Motion for Preliminary Injunction (Docket Entry No. 3) is **ALLOWED**.

**IT IS HEREBY ORDERED THAT**, effective immediately, and until further written order of this Court, defendants Massachusetts Department of Correction ("DOC") and Commissioner Carol Mici, and their officers, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with them, are enjoined and restrained from imposing any punitive, disciplinary, or other measures against incarcerated persons in the custody of DOC based solely on "positive" NARK 20023 test results.[11]

Brian A. Davis
Associate Justice of the Superior Court

Date: November 30, 2021

---

[11] See Commonwealth v. Adams, 416 Mass. 558, 566 (1993) (recognizing that as to injunctive relief, "[t]he law leaves to the sound discretion of the trial judge the issuance and scope of equitable relief"); Johnson v. Martignetti, 374 Mass. 784, 794 (1978) ("It is a well settled principle that, in fashioning appropriate relief, the issuance and scope of equitable relief rests within the sound discretion of the judge ... who may phrase the court's order so as to afford a full, complete remedy....The judge possesses a particularly broad latitude of discretion where the public interest is involved ... and may mould each decree to the necessities of each case.").