UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 21-11504-GAO

JULIAN GREEN, EUGENE IVEY, JAMES P. MCKENNA, and LISA NEWMAN-POLK,
individually and on behalf of all others similarly situated,
Plaintiffs,

v.

SIRCHIE ACQUISITION CO. LLC and PREMIER BIOTECH, INC.,
Defendants.

OPINION AND ORDER
September 28, 2022

O'TOOLE, D.J.

The plaintiffs Julian Green, Eugene Ivey, James McKenna, and Lisa Newman-Polk have brought this putative class action against the defendants Sirchie Acquisition Company LLC ("Sirchie") and Premier Biotech, Inc. ("Premier"), alleging negligence and violations of Chapter 93A of the Massachusetts General Laws. In short, the plaintiffs claim that the defendants repeatedly misrepresented the accuracy and quality of field drug tests that they sold to the Massachusetts Department of Corrections ("the DOC"). The plaintiffs further claim that those misrepresentations caused the DOC to inappropriately punish at least three inmates based on false positive drug test results. They also allege that attorneys representing those inmates suffered reputational harm and other injuries stemming from the erroneous punishment of their clients. The defendants have each moved to dismiss the complaint—which brings one count of each type against each defendant—for lack of standing and for failure to state a claim upon which relief can be granted. As discussed below, their motions are granted in part and denied in part.

I.    **Background**

A.    Introduction

The following facts are reported as alleged in the complaint. Sirchie manufactures, markets, and sells drug tests. Premier markets and sells tests that are manufactured by Sirchie. The plaintiffs Julian Green and Eugene Ivey ("the inmate plaintiffs") were inmates in DOC prisons during the relevant period—Green in MCI-Norfolk and Ivey in the Northeastern Correctional Center. The plaintiffs James McKenna and Lisa Newman-Polk ("the attorney plaintiffs") are attorneys who represent inmates in DOC prisons. Ms. Newman-Polk was Mr. Ivey's attorney.

The NARK 20023 is a field drug test that is manufactured by Sirchie. Premier markets and sells the NARK 20023 on Sirchie's behalf. The NARK 20023 purports to detect synthetic cannabinoids—that is, human-made chemicals that simulate tetrahydrocannabinol, the primary active ingredient in marijuana. Synthetic cannabinoids can be sprayed onto plant matter or paper, which can then be smoked to achieve similar effects to smoking marijuana. The NARK 20023 produces preliminary results indicating whether synthetic cannabinoids have been sprayed onto a piece of paper being tested; those results can later be re-tested in a lab at a higher level of scientific accuracy. Pursuant to generally accepted (and undisputed by either party) standards for such testing, the preliminary results of a field drug test are best viewed as presumptive, while the results of confirmatory laboratory testing can be viewed as definitive. A positive preliminary result that is later debunked by confirmatory testing is known as a "false positive." False positives are often the result of cross-reactivity—the occurrence of unintended chemical reactions between innocuous compounds and the compounds in the testing device.

The plaintiffs allege that the NARK 20023 is "underinclusive," "fundamentally flawed," and unable to "reliably detect the drugs for which [it] purport[s] to test," such that it "yield[s] false

positives at rates so high that its [preliminary] results are worse than random." (First. Am. Class Compl. at 5–6 (dkt. no. 26).) They claim that Sirchie and Premier have known of, and concealed, these issues for years.

      B.      The DOC Bidding Process

In 2017, the DOC solicited bids for field drug tests. The solicitation required bidders to "identify all substances the screening/testing device will not detect, or will not produce a positive result for," as well as "all substances known to cross-react, yielding a potentially false positive result." Id. at 8. The solicitation also required bidders to certify that their products met all relevant industry standards with regards to accuracy. In that same vein, the solicitation set a minimum accuracy threshold, requiring bidders to certify that their products produced false positive preliminary results in less than .05% of tests. The solicitation noted that "[f]alse positives between .05% and 10% may be grounds for [contract] termination" and that "[f]alse positives exceeding 10% will result in contract termination." Id. The complaint alleges that Premier failed to identify multiple substances known to cross-react in the NARK 20023 and failed to disclose that the NARK 20023's false positive rate exceeded both the .05% minimum accuracy bar and the 10% contract termination threshold. Premier was awarded the contract and began selling the NARK 20023 to the DOC around 2018. Since then, the DOC has used the NARK 20023 to test incoming inmate mail for the presence of synthetic cannabinoids.

Sirchie provides users of its products with written training materials, pre-recorded webinars, and live training sessions about the use of its tests. The plaintiffs claim that those trainings are misleading and inadequate. Sirchie allegedly instructs users of the NARK 20023 that any yellow or orange discoloration on the paper testing strip always indicates a positive result,

3

despite knowing that such discoloration is often caused by innocuous factors.[1] It is also alleged that Sirchie fails to properly educate trainees on the importance of confirmatory testing and the risk of cross-reaction. Sirchie is, and has always been, the sole source of training on the NARK 20023 used by DOC employees.

 C. The DOC's Misuse of the NARK 20023

 The complaint alleges three discrete instances of DOC employees misusing the NARK 20023 in a manner that harmed inmates. First, in August 2018, a NARK 20023 test allegedly detected synthetic cannabinoids on legal mail sent by Mr. McKenna to a client—who is not a plaintiff in this case—at the Souza-Baranowski Correctional Center. Mr. McKenna's client was issued a disciplinary ticket, confined to his cell twenty-three hours per day for three days, stripped of his job within the prison, and denied a previously approved opportunity to move to a lower security facility. Four months later, confirmatory testing showed that the preliminary result had been a false positive. Mr. McKenna's client never received the mail at issue.

 Second, in November 2019, a NARK 20023 test at MCI-Norfolk allegedly detected synthetic cannabinoids on legal mail sent to Mr. Green by his attorney. Mr. Green was immediately issued a disciplinary ticket and sent to the Restrictive Housing Unit ("RHU"), where he was confined to his cell for twenty-three hours per day for three weeks. While in the RHU, he missed activities and college-level classes, and his communications were limited. DOC employees allegedly attempted to dissuade him from pursuing confirmatory testing during that time. Two months later, confirmatory testing showed that the preliminary result had been a false positive. When Mr. Green finally received the tested mail, it was too damaged to read.

---

[1] The plaintiffs claim that the chemicals in the NARK 20023 routinely turn paper yellow, orange, or tan, regardless of whether drugs are present, and that such discoloration is frequently caused by cross-reaction with chemicals found in commercially available papers, printers, and inks.

Finally, in August 2020, a NARK 20023 test allegedly detected synthetic cannabinoids on legal mail sent to Mr. Ivey by Ms. Newman-Polk. Mr. Ivey was immediately sent to the RHU, interrogated by DOC officials, and issued a disciplinary ticket charging him with eight separate offenses. He was later moved to the Special Adjustment Unit ("SAU"), a punitive housing unit focused on substance use disorder, which he claims he did not have. While in the RHU and SAU, Mr. Ivey could not attend college courses or activities, and he lost his job within the prison. In September 2020, confirmatory testing allegedly revealed that the preliminary result had been a false positive, but Mr. Ivey and Ms. Newman-Polk were not notified. One month later, the DOC informed Ms. Newman-Polk that it would be maintaining its punitive measures against Mr. Ivey, again failing to inform her of the confirmatory testing result. Mr. Ivey remained under punitive measures for another two weeks before his disciplinary ticket was dismissed based on the negative confirmatory results. In all, he missed nearly a full semester of college courses, delaying his graduation from the program.

The plaintiffs attribute the DOC's misuse of the NARK 20023—and the attendant harms that befell them—to the actions and omissions of Sirchie and Premier. They claim that the misrepresentations and omissions in Premier's bid caused the DOC to purchase and trust a product that fell below its identified accuracy standards. They further claim that the inadequacy of the training materials Sirchie provided to the DOC all but ensured that DOC employees would underestimate the product's flaws, misinterpret preliminary results, and make decisions adverse to inmates based on false positives.

## II.   The Attorney Plaintiffs' Standing

The defendants first argue that the attorney plaintiffs lack standing to sue. To demonstrate standing that survives a motion to dismiss, a plaintiff must allege an injury that is cognizable,

"fairly traceable" to the defendant's conduct, and redressable in court. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). The attorney plaintiffs allege damage to their client relationships, damage to their reputations, fear of prosecution, and emotional distress. Those allegations, as pled in the complaint, do not describe a cognizable injury.

The attorney plaintiffs' three allegations of tangible injury all come up short. Regarding business interference, they merely allege that they had limited access to their clients, and that some legal mail was damaged or lost. They do not allege "direct economic injury," Craig v. Boren, 429 U.S. 190, 194 (1976), or a "deprivation of a part of [their] livelihood[s]." Steele v. Nat'l Firearms Act Branch, 755 F.2d 1410, 1414 (11th Cir. 1985).[2] As to reputational injury, they claim only that DOC officials privately told them about the test results. Critically, the complaint does not allege a reputational injury stemming from the actual *dissemination* of harmful information by either the defendants or the DOC. "A letter that is not sent does not harm anyone, no matter how insulting the letter is." TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2210 (2021). Finally, the attorney plaintiffs fail to allege a "credible threat" of prosecution, see Susan B. Anthony List v. Driehaus, 573 U.S. 149, 161–67 (2014), because they cannot show that "the threatened injury [was] certainly impending." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 401 (2013). Indeed, they were never actually threatened, and the defendants and the DOC lack prosecutorial authority over them; they have managed to allege only a "highly speculative fear" of prosecution. See id. at 410.

The attorney plaintiffs, then, allege only a "free-standing" claim of emotional harm—one that does not stem from "the infringement of some legally protected or judicially cognizable interest . . . ." Magruder v. Cap. One, Nat'l Ass'n, 540 F. Supp. 3d 1, 8 (D.D.C. 2021) (quoting

---

[2] They claim in their brief that they were subjected to potential malpractice liability and attendant economic risk, but those arguments lack support in the complaint.

Al-Aulaqi v. Obama, 727 F. Supp. 2d 1, 25 (D.D.C. 2010)). Standalone claims of that nature "cannot suffice for injury-in-fact for standing purposes." Magruder, 540 F. Supp. 3d at 8 (citation omitted). Because the attorney plaintiffs cannot identify an actual harm from which their alleged emotional injuries stem, those emotional injuries cannot support standing. See Spokeo, Inc. v. Robins, 578 U.S. 330, 340–41 (2016).

### III.    The Inmate Plaintiffs' Negligence Claim

The defendants next argue that the complaint fails to state a claim for negligence. To avoid dismissal of this claim, the inmate plaintiffs must properly allege that the defendants owed them a duty of care, and that the defendants then breached that duty in a manner that caused injury to them. Jupin v. Kask, 447 Mass. 141, 146 (Mass. 2006). They have done so; the allegations in the complaint, if proven at trial, would support a finding that both defendants acted negligently.

### A.    Duty

No court in the First Circuit has yet considered whether manufacturers and marketers of drug tests owe a duty of care to third party testing subjects with whom they did not contract. The relevant caselaw from other federal and state courts, however, indicates that such a duty does exist, at least in the circumstances alleged in the complaint.

Steele-Warrick v. Microgenics Corp., No. 19 Civ. 6558 (VMS), 2021 WL 1109052 (E.D.N.Y. Mar. 22, 2021), offers recent, helpful analysis of this question. In that case, the defendants—a manufacturer and marketer of urinalysis machines and its subsidiary—won a bid to provide the State of New York with machines for use in state-run prisons. The plaintiff, an inmate, alleged that the defendants failed to disclose the risk of cross-reactivity in their bid and provided misleading training materials to the State. As a result, she claimed, the State punished inmates based on false positive preliminary results, unaware that the tests were faulty and needed

verification. The court noted that the defendants "were in the best position to prevent false positive results given that [New York's] inmate urinalysis testing relied upon Defendant's warranties that their IPUA machines, products and service platforms would be provided consistent with relevant professional standards." Id. at *10. The court therefore held that the defendants owed a duty to inmates to "adhere to standards that implicate the scientific integrity of the testing process" and act with due care to prevent false positive test results. Id. (citation omitted).

Other federal courts have similarly recognized "a limited duty on the part of the [drug testing] laboratory to [third parties] who are the subject of the tests." Cooper v. Lab'y Corp. of Am. Holdings, 150 F.3d 376, 379–80 (4th Cir. 1998). That duty often hinges on foreseeability; indeed, it is hard to "imagine a more foreseeable harm than the harm that may result from inaccurate laboratory testing of individuals." Quisenberry v. Compass Vision, Inc., 618 F. Supp. 2d 1223, 1230–31 (S.D. Cal. 2007); see also Chapman v. Labone, 460 F. Supp. 2d 989, 1001 (S.D. Iowa 2006); Santiago v. Greyhound Lines, Inc., 956 F. Supp. 144, 152 (N.D.N.Y. 1997). Most state courts to address the issue have reached the same conclusion, imposing a limited duty on drug testing labs. See, e.g., Landon v. Kroll Lab'y Specialists, Inc., 999 N.E.2d 1121, 1124–25 (N.Y. 2013); Berry v. Nat'l Med. Servs., Inc., 257 P.3d 287, 290–92 (Kan. 2011); Sharpe v. St. Luke's Hosp., 821 A.2d 1215, 1219–21 (Pa. 2003); Stinson v. Physicians Immediate Care, Ltd., 646 N.E.2d 930, 934 (Ill. App. Ct. 1995); but see SmithKline Beecham Corp. v. Doe, 903 S.W.2d 347, 351–52 (Tex. 1995).

The reasoning adopted by those courts applies here. Sirchie and Premier—as the manufacturer and marketer of the NARK 20023 and the sole sources of training available to the DOC—were best positioned to protect inmates by ensuring that their tests were accurate and that DOC employees knew how to use them. The inmate plaintiffs have adequately alleged that the

defendants owed them a duty to act with reasonable care to preserve the scientific integrity of the testing process, limit cross-reactivity, and prevent erroneous reliance on false positive results.

### B.   Breach

The complaint also adequately alleges that both Sirchie and Premier breached their duty of care. Sirchie allegedly instructed the DOC that any yellow or orange coloration on a NARK 20023 testing strip always indicates the presence of synthetic cannabinoids, despite knowing that proposition to be false. Sirchie also allegedly misled DOC employees about the risk of cross-reaction, misrepresented the types of compounds that cause false positive results, and downplayed the importance of confirmatory testing. For its part, Premier allegedly failed to identify cross-reactive agents as instructed by the DOC's solicitation, falsely claimed that it had seen no evidence of unreliability, and misrepresented the NARK 20023's error rate in its initial bid to the DOC and in subsequent communications. Those actions clearly constitute breaches.

### C.   Causation

To properly allege factual and proximate causation, a plaintiff must show that the defendant's negligence was a "but-for" cause of his injury, Doull v. Foster, 163 N.E.3d 976, 988–90 (Mass. 2021), and that his injury was "a foreseeable result" of the defendant's acts or omissions. Kent v. Commonwealth, 771 N.E.2d 770, 777 (Mass. 2002). The intervening act of a third party "does not excuse" the defendant from liability for the injury if the intervening act and its consequences were foreseeable. Mullins v. Pine Manor Coll., 449 N.E.2d 331, 341 (Mass. 1983).

The complaint sufficiently alleges but-for causation as to both defendants. If Sirchie had properly trained DOC employees—instead of misleading them as alleged—then those employees would have known not to rely on unconfirmed preliminary results, and the inmate plaintiffs likely would not have been disciplined. See Doull, 163 N.E.3d at 987 ("The focus . . . remains only on

whether, in the absence of a defendant's conduct, the harm still would have occurred."). Similarly, if Premier had disclosed in its bid that the NARK 20023 did not meet the DOC's accuracy requirements, then the DOC likely would not have purchased the test, and the inmate plaintiffs would not have been harmed by its misuse. See id.

The complaint also alleges proximate causation as to both defendants; the intervening acts of DOC employees do not absolve the defendants at this stage. It was foreseeable that DOC employees, in their reliance on Sirchie's training materials and the representations that Premier made during the bidding process, would underestimate the risk of cross-reaction and make decisions (including decisions related to inmate punishment) based on faulty preliminary results. See Santiago, 956 F. Supp. at 152–53; see also Shuras v. Integrated Project Servs., Inc., 190 F. Supp. 2d 194, 199 (D. Mass. 2002) ("[T]he manufacturer must anticipate the environment and manner in which consumers will use its products, including foreseeable misuses."). Unjustified inmate punishment is a plausibly foreseeable result of an erroneous prison drug test. Cf. Santiago, 956 F. Supp. at 152–53.

D.    Damages

The final element of a negligence claim is easily disposed of here. The inmate plaintiffs allege both economic injuries (the loss of wage-earning jobs in the institutions) and non-economic injuries (assignment to punitive housing units, increased confinement, and missed classes and activities) that support a claim for negligence under Massachusetts law. See Portier v. NEO Tech. Sols., No. 17-cv-30111-TSH, 2019 WL 7946103, at *14–16 (D. Mass. Dec. 31, 2019).

**IV.    The Inmate Plaintiffs' 93A Claim**

Finally, the defendants argue that the complaint fails to state a claim under Chapter 93A. A 93A plaintiff must allege that the defendant committed an unfair or deceptive act during trade

or commerce that caused injury to him. Rafferty v. Merck & Co., Inc., 92 N.E.3d 1205, 1222–23 (Mass. 2018). An individual need only allege that he was injured by a defendant's wrongful act to bring a 93A claim; privity of contract with the defendant is not required. Maillet v. ATF-Davidson Co., 552 N.E.2d 95, 99–100 (Mass. 1990). An "unfair" act is "immoral, unethical, oppressive, or unscrupulous . . . ." Linkage Corp. v. Trs. of Bos. Univ., 679 N.E.2d 191, 209 (Mass. 1997) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (1975)). A "failure to warn of a defective or dangerous condition that could cause personal injury" qualifies. Maillet, 552 N.E.2d at 99–100. A "deceptive" act "has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted . . . ." Aspinall v. Philip Morris Cos., Inc., 813 N.E.2d 476, 488 (Mass. 2004). A deceptive act "need not be totally false" to be actionable; it "may consist of a half truth, or even may be true as a literal matter, but still create an over-all misleading impression through failure to disclose material information." Id. at 487. A deceptive act can also be actionable even if the defendant believed that the statement was true. Id. at 486.

The plaintiffs' allegations that Sirchie knowingly disseminated misleading training materials satisfy the pleading requirements of Chapter 93A. Those allegations describe "failure[s] to warn," Maillet, 552 N.E.2d at 99, "half truth[s]," Aspinall, 813 N.E.2d at 487, and "negligent misrepresentation[s] of fact" on the part of Sirchie. Glickman v. Brown, 486 N.E.2d 737, 741 (Mass. App. Ct. 1985), abrogated on other grounds by Cigal v. Leader Dev. Corp., 557 N.E.2d 1119 (Mass. 1990). Similarly, the allegations against Premier describe "failure[s] to warn," Maillet, 552 N.E.2d at 99, and "negligent misrepresentations of fact" in the bidding process; they, too, pass muster at this stage. Glickman, 486 N.E.2d at 741 ("[S]ellers should not be allowed to misrepresent the truth simply because they have not made reasonable efforts to ascertain it."). The

11

inmate plaintiffs have adequately alleged both deceptive and unfair business practices, on the part

of both defendants, that would constitute violations of Chapter 93A if proven at trial.

**V.**      **Conclusion**

For the foregoing reasons, Sirchie Acquisition Co. LLC's Motion to Dismiss (dkt. no. 34)

and Premier Biotech, Inc.'s Motion to Dismiss Plaintiffs' Amended Complaint for Failure to State

a Claim (dkt. no. 41) are GRANTED as to the claims of the plaintiffs James McKenna and Lisa

Newman-Polk but DENIED as to the claims of the plaintiffs Julian Green and Eugene Ivey. The

claims of the attorney plaintiffs are dismissed for lack of standing. The inmate plaintiffs, however,

have stated claims against both defendants for negligence and for violations of Chapter 93A.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge